# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 02-3914, 02-3915

UNITED STATES OF AMERICA,

*Petitioner-Appellee*,

*v.*

BDO SEIDMAN, regarding promoter
examination of BDO SEIDMAN,

*Respondent-Appellee.*

APPEALS OF: JOHN DOE and
JANE DOE and RICHARD ROE and
MARY ROE,

*Proposed Intervenors.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 4822—**Milton I. Shadur**, *Judge.*

_____

ARGUED MAY 30, 2003—DECIDED JULY 23, 2003

_____

Before RIPPLE, KANNE and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Several unnamed clients of BDO
Seidman, LLP ("BDO"), a public accounting and consulting
firm, appeal from the district court's denial of their motions

to intervene in an Internal Revenue Service ("IRS") enforcement action against BDO.

The IRS had issued twenty summonses to BDO as part of its investigation of BDO's compliance with Internal Revenue Code registration and list-keeping requirements for organizers and sellers of potentially abusive tax shelters. *See* 26 U.S.C. §§ 6111, 6112. The clients sought to intervene to assert a confidentiality privilege regarding certain documents that BDO intended to produce in response to those summonses. The clients argued that, because these documents reveal their identities as BDO clients who sought advice regarding tax shelters and who subsequently invested in those shelters, disclosure inevitably would violate the statutory privilege protecting confidential communications between a taxpayer and any federally authorized tax practitioner giving tax advice. *See* 26 U.S.C. § 7525. For the reasons that follow, we affirm the district court's denial of the clients' motions to intervene.

# I

# BACKGROUND

## A.  The Enforcement Action

In September 2000, the IRS received information suggesting that BDO was promoting potentially abusive tax shelters without complying with the registration and listing requirements for organizers and sellers of tax shelters. *See* 26 U.S.C. §§ 6111, 6112. Section 6111(a) of the Internal Revenue Code requires organizers of tax shelters to register the tax shelter with the IRS. *See* 26 U.S.C. § 6111(a). Any tax shelter required to be registered under § 6111, as well as any "arrangement which is of a type which the Secretary determines by regulations as having a potential for tax

avoidance or evasion," is considered to be "potentially abusive." 26 U.S.C. § 6112(b). Accordingly, the organizers and sellers of such tax shelters must keep a list identifying each person to whom an interest of the tax shelter was sold. *See* 26 U.S.C. § 6112(a). Failure to comply with the registration and listing requirements of § 6111 and § 6112 can lead to the imposition of penalties. *See* 26 U.S.C. §§ 6707, 6708. Because the IRS suspected that BDO had violated these statutory provisions by organizing and selling interests in potentially abusive tax shelters without complying with the registration and list-keeping requirements, it issued a series of summonses to BDO, identifying twenty types of tax shelter transactions in which it suspected that BDO's clients had invested.

The summonses command production of documents and testimony relating to the identified transactions, as well as information about BDO clients who invested in the identified tax shelters. For example, the summonses demand documents identifying the investors in the transactions, the date on which those investors acquired an interest, and all tax shelter registrations filed and investor lists prepared with respect to the transactions.

In July 2002, when BDO failed to produce documents as required by the summonses, the IRS petitioned the district court for enforcement. BDO opposed enforcement. It argued that the investigation did not have a legitimate purpose, that the summonses were overbroad and issued in bad faith, and that the information sought was already in the possession of the IRS and was not relevant to the investigation. BDO also claimed that some of the summoned information was protected from disclosure by the attorney-client privilege, the work product doctrine, and the confidentiality privilege of § 7525 of the Internal Revenue Code. In October 2002, the district court ruled that the IRS had

met its burden of showing that it issued the summonses in good faith, and that BDO had failed to show that enforcement of the summonses would constitute an abuse of process. *See United States v. BDO Seidman, LLP*, 225 F. Supp. 2d 918, 920 (N.D. Ill. 2002). The district court then directed BDO to produce, on or before November 4, 2002, all responsive documents except those that BDO previously had listed on privilege logs and submitted to the court for an *in camera* review.

**B. The Motions to Intervene**

Among the responsive documents not previously submitted for the court's *in camera* inspection were records that reveal the identities of the BDO clients who invested in at least one of the 20 types of tax shelters identified in the summonses. BDO informed its clients that it intended to produce these documents to the IRS. In response, two sets of unidentified taxpayers—the John and Jane Does and the Richard and Mary Roes (hereinafter referred to collectively as "the Does")—filed emergency motions to intervene in the enforcement proceedings pursuant to Federal Rule of Civil Procedure 24(a)(2). The Does, asserting that they are BDO clients who sought BDO's confidential advice regarding the potential tax effects of certain proposed financial transactions, argued that the documents revealing their identities are privileged under 26 U.S.C. § 7525, and that BDO was not adequately representing their interest in keeping that information confidential. The Does conceded that, aside from the fact that the documents reveal their identities as BDO clients who invested in at least one of the 20 types of tax shelters described in the summonses, the documents themselves do not contain any otherwise privileged communication. After a hearing, the district court denied the Does' emergency motions to intervene. The

court concluded that information regarding a client's identity falls outside the scope of the § 7525 privilege. Because the district court did not believe that the Does would have a likelihood of success on the merits of an appeal, it denied the Does' motion for a stay of its enforcement order.

The Does filed timely notices of appeal from the denial of their motions to intervene and requested that this court stay the production of the documents to which they had asserted a privilege in the district court. We granted a temporary stay and remanded the case to the district court for the limited purpose of permitting the district court to enter more extensive findings regarding those documents to which the Does claim a privilege. The remand order directed the district court to perform an *in camera* inspection of the documents at issue and to enter specific findings considering the totality of the circumstances surrounding the Does' privilege claim.

### C. The Limited Remand

On this limited remand, the district court did not perform a comprehensive review of all the documents that contained information identifying the Does, but instead requested counsel to produce a subset for *in camera* inspection. Specifically, the court ordered counsel to produce all confidentiality agreements, consulting agreements and engagement letters entered into between BDO and the Does. Upon reviewing this subset of documents, the court determined that the identities of at least 55 Does were not subject to privilege under § 7525. It noted that many of the confidentiality agreements establish that particular Does engaged BDO's services, in part, for the purpose of preparing income tax returns. In addition, several consulting agreements contained a "No Warranty" provision, which

states that "BDO's Services hereunder do not include . . . any legal and/or tax opinions regarding any strategies that may be implemented." *See United States v. BDO Seidman, LLP*, No. 02 C 4822, 2003 WL 932365, at *3 (N.D. Ill. Feb. 5, 2003). This language, the court determined, suggests that the relationship between BDO and the Does was not always that of tax advisor-client and that, in such cases, their communications would not be subject to the § 7525 privilege. *See id.* at *3-4. Accordingly, the district court found that 133 of the documents it had reviewed established that BDO's communications with 55 Does had not been for the purpose of providing tax advice, and were therefore not privileged. Furthermore, the court concluded, 28 of the documents were generated for the purpose of preparing tax returns, another unprivileged category of communication. *See id.* at *2 (citing *United States v. Frederick*, 182 F.3d 496 (7th Cir. 1999)). Finally, with respect to 30 unidentified clients who sought intervention, the court was unable to make findings because no confidentiality agreements, consulting agreements or engagement letters had been produced on their behalf.

## II

## DISCUSSION

On appeal, the Does submit that the district court erred when it denied their motions to intervene on the ground that the Does lacked a colorable claim of privilege under § 7525. Because the Does sought intervention as of right, Fed. R. Civ. P. 24(a)(2), they had the burden of establishing that: (1) their motions to intervene were timely; (2) they possess an interest related to the subject matter of the enforcement action; (3) disposition of the action threatens to impair that interest; and (4) the IRS and BDO fail to repre-

sent adequately their interest. *See Vollmer v. Publishers Clearing House*, 248 F.3d 698, 705 (7th Cir. 2001). To satisfy these requirements, the Does must show that the "interest" asserted is a "direct, significant, legally protectable" one. *Sec. Ins. Co. of Hartford v. Schipporeit*, 69 F.3d 1377, 1380 (7th Cir. 1995) (citation omitted). A colorable claim of privilege could constitute a legally protectable interest sufficiently significant to warrant intervention as of right, assuming that the three remaining factors are also satisfied. *See In re Grand Jury Subpoena*, 274 F.3d 563, 570 (1st Cir. 2001). Failure to satisfy any one of the four intervention factors is sufficient grounds to deny the intervention. *See Vollmer,* 248 F.3d at 705. This court reviews the foregoing factors de novo, with the exception of the first factor—the timeliness of the intervention—which this court reviews for abuse of discretion. *Id.* at 705-06; *Nissei Sangyo Am., Ltd. v. United States*, 31 F.3d 435, 438 (7th Cir. 1994).

Before us, the only factor that the IRS disputes is whether the Does satisfied their burden of demonstrating a legally protectable interest in preventing the disclosure of the documents that would reveal their identities as individuals who sought BDO's advice regarding tax shelters.

In the course of their submission, the Does advance several additional arguments that challenge the district court's findings and conclusions on limited remand. For example, they argue that the district court's factual findings were clearly erroneous because the court failed to consider the totality of the circumstances surrounding each document. They further argue that the district court erroneously concluded that the asserted privilege would not have attached even if the court properly found that BDO prepared tax returns for some unidentified clients who discussed tax shelters with BDO. Finally, the Does contend that there is no basis to uphold the district court's production order with

respect to the 30 unidentified clients for whom no findings were made on the limited remand. These arguments all presuppose that the district court erroneously concluded that the § 7525 privilege cannot be asserted to prevent the disclosure of their identities. If that initial premise proves wrong, there would be no reason to address any of these arguments.

We have jurisdiction to review the district court's orders because they definitively preclude the Does' future participation in the IRS enforcement action against BDO. *See United States v. City of Milwaukee,* 144 F.3d 524, 528 (7th Cir. 1998); *Williams v. Katz*, 23 F.3d 190, 191-92 (7th Cir. 1994).

## A.  A Colorable Claim of Privilege

The primary issue before us is whether the district court erred when it denied the Does' motions to intervene because it believed that they had failed to establish a colorable claim of privilege under § 7525. Unless the Does can establish that the § 7525 privilege can protect a taxpayer's identity from disclosure in the IRS enforcement action, the Does will not prevail on appeal. Whether the scope of the § 7525 privilege includes protection against the disclosure of client identity is a question of law that this court reviews de novo. *See In re Subpoenaed Grand Jury Witness,* 171 F.3d 511, 512 (7th Cir. 1999).

### 1.  Regulatory Context

We first consider the regulatory context in which the Does' claim of privilege arises. The Does sought to intervene in proceedings involving the IRS investigation of BDO for potential violations of the tax code, including the provisions requiring organizers of tax shelters to register tax

shelters with the IRS, 26 U.S.C. § 6111, and organizers and sellers of such shelters to keep lists of the investors, 26 U.S.C. § 6112. These provisions were enacted by Congress as part of the Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494 (1984), for the purpose of providing the IRS with means to better monitor tax shelters, and, consequently, to deter abusive tax shelters that can adversely impact public revenues. *See* Elizabeth K. Lewicki, *The Regulation of Tax Shelters and New Internal Revenue Code Section 469: A Complex and Unnecessary Addition to the War on Abusive Tax Shelters,* 19 Pac. L.J. 101, 115-16 (1987). Before 1984, no systematic information was available to assist the IRS in identifying the shelters that should be investigated. H.R. Conf. Rep. No. 98-861, at 977 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 1665. The IRS could audit individual taxpayers, but such a process only randomly identified participants in potentially abusive tax shelters. *Lewicki*, 19 Pac. L.J. at 116. The statutory registration and list-keeping provisions allow the IRS to identify more easily those transactions that it deems to be abusive and "to identify quickly all of the participants in related tax-shelter investments." H.R. Rep. No. 98-432, pt. 2, at 1351-52 (1984), *reprinted in* 1984 U.S.C.C.A.N. 697, 1004-05. These provisions also enable the IRS to examine every purchaser of a given type of tax shelter investment and to treat those taxpayers in a more uniform manner. *Id.*

Congress, by granting the IRS the broad power to issue summonses to investigate violations of the tax code, *see* 26 U.S.C. § 7602, further provides the IRS with great latitude to verify compliance with these tax shelter registration and list-keeping provisions. *See also Holifield v. United States,* 909 F.2d 201, 205 (7th Cir. 1990). Nevertheless, despite these powerful investigative tools, the IRS' investigatory power is not absolute. If a taxpayer fails to comply with a sum-

mons, the IRS must apply to the district court to secure an enforcement order. *See* 26 U.S.C. § 7604. Prior to enforcing tax summonses, the court must scrutinize them to determine whether they are made in good faith and seek information relevant to a legitimate investigative purpose. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964); *Miller v. United States*, 150 F.3d 770, 772 (7th Cir. 1998). Once the Government makes a prima facie showing of good faith, the burden shifts to the respondent to show that the enforcement of the summons would constitute an abuse of process. *See 2121 Arlington Heights Corp. v. IRS*, 109 F.3d 1221, 1224 (7th Cir. 1997). "Summons enforcement proceedings are intended to be summary in nature," and it is left to the district court's discretion to determine whether a hearing is necessary. *Id.* at 1226 (citations omitted).

The IRS' broad power to investigate possible violations of the tax laws is understood to be vital to the efficacy of the federal tax system, "which seeks to assure that taxpayers pay what Congress has mandated and to prevent dishonest persons from escaping taxation thus shifting heavier burdens to honest taxpayers." *United States v. Bisceglia*, 420 U.S. 141, 146 (1975). As the Supreme Court has noted, "the very language of § 7602 reflects . . . a congressional policy choice *in favor of disclosure* of all information relevant to a legitimate IRS inquiry." *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984). Because the IRS' investigatory powers are essential to the proper functioning of the tax system, courts are reluctant to restrict the IRS' summons power, absent unambiguous direction from Congress. *See 2121 Arlington Heights*, 109 F.3d at 1225 (citations omitted). Nevertheless, a court's power to enforce a summons is not absolute; it is subject to traditional privileges. *Arthur Young & Co.*, 465 U.S. at 816.

### 2. 26 U.S.C. § 7525

Having described the general framework of this regulatory authority, we now turn to the specific context of the Does' claim. The Does seek to intervene to prevent the disclosure, through IRS summonses, of documents that the Does contend are privileged. The Does' privilege claim rests entirely on § 7525, a statute enacted on July 22, 1998, to provide a confidentiality privilege for communications between a taxpayer and a tax practitioner. This limited privilege applies only to communications occurring after the date of the statute's enactment. *See Frederick*, 182 F.3d at 502. Section 7525, provides in pertinent part:

> With respect to tax advice, the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney.

26 U.S.C. § 7525(a)(1). Thus the § 7525 privilege is no broader than that of the attorney-client privilege, and "[n]othing in [§ 7525] suggests that . . . nonlawyer practitioners are entitled to privilege when they are doing other than lawyers' work." *Frederick*, 182 F.3d at 502. Because the scope of the tax practitioner-client privilege depends on the scope of the common law protections of confidential attorney-client communications, we must look to the body of common law interpreting the attorney-client privilege to interpret the § 7525 privilege.

The attorney-client privilege is "one of the oldest recognized privileges for confidential communications" known to the common law. *Swidler & Berlin v. United States*, 524

U.S. 399, 403 (1998). The purpose of the privilege is to encourage full disclosure and to facilitate open communication between attorneys and their clients. *Id.* However, because "the privilege has the effect of withholding relevant information," courts construe the privilege to apply only where necessary to achieve its purpose. *Fisher v. United States*, 425 U.S. 391, 403 (1976); *see In re Grand Jury Proceeding (Cherney)*, 898 F.2d 565, 567 (7th Cir. 1990). The mere assertion of a privilege is not enough; instead, a party that seeks to invoke the attorney-client privilege has the burden of establishing all of its essential elements. *See In re Grand Jury Proceedings (Thullen)*, 220 F.3d 568, 571 (7th Cir. 2000); *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997).

A party that seeks to assert a § 7525 privilege bears the same burden. Among the essential elements of the attorney-client privilege are the requirements that the communication be made to the attorney in confidence, *see Thullen*, 220 F.3d at 571, and that the confidences constitute information that is not intended to be disclosed by the attorney, *see United States v. Weger*, 709 F.2d 1151, 1154 (7th Cir. 1983) ("the privilege protects only the client's confidences, not things which, at the time, are not intended to be held in the breast of the lawyer") (citation omitted); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir. 1984) ("[C]ourts have consistently 'refused to apply the privilege to information that the client intends his attorney to impart to others . . .,' or which the client intends shall be published or made known to others.") (collecting cases). Furthermore, the party asserting a privilege must show that the attorney-client communication was made for the purpose of obtaining legal advice, or, more precisely in the case of the § 7525 privilege, tax advice. *See Thullen*, 220 F.3d at 571.

The attorney-client privilege protects confidential *communications* made by a client to his lawyer, and so ordinarily

the identity of a client does not come within the scope of the privilege. *Tillotson v. Boughner*, 350 F.2d 663, 666 (7th Cir. 1965). However, over the years, a limited exception to this general rule has developed; the identity of a client may be privileged in the rare circumstance when so much of an actual confidential communication has been disclosed already that merely identifying the client will effectively disclose that communication. *See In re Subpoenaed Grand Jury Witness*, 171 F.3d at 514; *Cherney*, 898 F.2d at 568; *In re Witnesses Before the Special March 1980 Grand Jury*, 729 F.2d 489, 494 (7th Cir. 1984); *Tillotson*, 350 F.2d at 666.

In their discussion of this narrow exception, the parties primarily focus on two cases in which we held that attorney-client privilege could prevent the disclosure of a client's identity. In *Tillotson*, an unidentified taxpayer had determined that he understated his tax liability on previously filed returns and retained an attorney to deliver a cashier's check in the amount of $215,499.95 to the IRS. 350 F.2d at 663-65. The IRS sought to enforce a summons it had served on the attorney, demanding that he testify about his client. The attorney asserted the attorney-client privilege and refused to disclose his client's identity. *Id.* We upheld the invocation of the privilege because "under the peculiar facts of this case, the attorney-client privilege includes, within its scope, the identity of the client." *Id.* at 665. We reasoned that the IRS had become aware of the substantive content of the confidential communication between the unknown taxpayer and his attorney—namely, the taxpayer's tax liability—the moment the cashier's check was delivered. Because revealing the taxpayer's identity would also reveal the content of the confidential communication, the privilege attached. *Id.* at 666. Similarly, in *Cherney*, we held that the privilege encompasses the identity of a client when the Government knows that the unidentified client paid

fees for a criminal defendant out of concern about his own involvement in the charged drug conspiracy. 898 F.2d at 568. In that case, we explained, the client's identity was privileged "because its disclosure would be tantamount to revealing the premise of a confidential communication: the very substantive reason that the client sought legal advice in the first place." *Id.* In other words, "the privilege protects an unknown client's identity where its disclosure would reveal a client's motive for seeking legal advice." *Id.; see In re Subpoenaed Grand Jury Witness*, 171 F.3d at 514; *Tillotson*, 350 F.2d at 666.

Relying on these cases, the Does submit that the IRS' summonses set forth such detailed descriptions about suspect types of tax shelters under investigation that any document produced in response that also reveals a client's identity will inevitably reveal that client's *motivation* for seeking tax advice from BDO. The Does define their "motive" for retaining BDO's services as the "desire to engage in financial transactions which the government might later decide to be questionable, or . . . 'potentially abusive.' " Appellants' Br. at 16. Because a client's "motive" for seeking legal advice is considered a confidential communication, the Does contend that the § 7525 privilege should protect against the disclosure of their motive for seeking tax advice, a motive that would be known if their identities are revealed.

The Does have not established that a confidential communication will be disclosed if their identities are revealed in response to the summonses. Disclosure of the identities of the Does will disclose to the IRS that the Does participated in one of the 20 types of tax shelters described in its summonses. It is less than clear, however, as to what motive, or other confidential communication of tax advice, can be inferred from that information alone. Compared to the

situations in the *Tillotson* and *Cherney* cases, where the Government already knew much about the substance of the communications between the attorney and his unidentified client, in this case the IRS knows relatively little about the interactions between BDO and the Does, the nature of their relationship, or the substance of their conversations. Moreover, the Does concede that the documents that BDO intends to produce in response to the summonses are not subject to any other independent claim of privilege beyond the Does' assertion of privilege as to identity.

More fundamentally, the Does' participation in potentially abusive tax shelters is information ordinarily subject to full disclosure under the federal tax law. *See* 26 U.S.C §§ 6111, 6112. Congress has determined that tax shelters are subject to special scrutiny, and anyone who organizes or sells an interest in tax shelters is required, pursuant to I.R.C. § 6112, to maintain a list identifying each person to whom such an interest was sold. This list-keeping provision precludes the Does from establishing an *expectation of confidentiality* in their communications with BDO, an essential element of the attorney-client privilege and, by extension, the § 7525 privilege. *See Evans*, 113 F.3d at 1461. At the time that the Does communicated their interest in participating in tax shelters that BDO organized or sold, the Does should have known that BDO was obligated to disclose the identity of clients engaging in such financial transactions. Because the Does cannot credibly argue that they expected that their participation in such transactions would not be disclosed, they cannot now establish that the documents responsive to the summonses, which do not contain any tax advice, reveal a *confidential* communication. *Thullen*, 220 F.3d at 571 (a communication must be made in confidence to be privileged under § 7525).

BDO's affirmative duty to disclose its clients' participation in potentially abusive tax shelters renders the Does'

situation easily distinguishable from the limited circumstances in which we have determined that a client's identity was information subject to the attorney-client privilege. The district court committed no error when it concluded that the Does failed to establish a colorable claim of privilege under § 7525.

## Conclusion

Because the Does cannot demonstrate a colorable claim of privilege, they have failed to establish a legally protectable interest in preventing the disclosure of the documents revealing their identities as individuals who participated in tax shelters promoted by the BDO. For the reasons stated above, the district court's judgments denying the Does' motions for intervention are affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*