In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3473

VALERO ENERGY CORPORATION,
in its own right and as successor to
Ultramar Diamond Shamrock Corporation,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 6730—**Matthew F. Kennelly,** *Judge.*

ARGUED FEBRUARY 18, 2009—DECIDED JUNE 17, 2009

Before ROVNER, EVANS, and TINDER, *Circuit Judges.*

EVANS, *Circuit Judge.* In this appeal, Valero Energy Corporation asks us to take a close look at the tax practitioner-client privilege. Valero sought to protect several documents under this privilege, and the result was a mixed bag—some documents were shielded from the Internal Revenue Service, while others were not.

Valero now contends that by reaching this decision, the district court misconstrued not only the privilege, but also an exception to the privilege, which grants the government access to certain documents when tax shelters are promoted.

Valero is a large company involved in crude oil refining (it's the largest refiner in the United States according to its Web site) and oil-product marketing. The Texas-based giant got even bigger in December 2001, when it acquired Ultramar Diamond Shamrock Corporation (UDS), an oil company with Canadian subsidiaries. This acquisition not only expanded Valero's reach northward, it also resulted in some pretty hefty tax savings. Before the deal took place, UDS consulted with Ernst & Young about restructuring and refinancing its Canadian operations. Valero, in turn, called on its long-time advisors at Arthur Anderson to review Ernst & Young's plan and provide further tax advice. At this time, the Canadian currency was in a slump vis-à-vis the United States dollar, and Valero took advantage. In 2002, shortly after the acquisition was completed, Valero realized $105 million in tax-deductible foreign currency losses (under 26 U.S.C. §§ 987, 988) through a complicated series of transactions implemented with Arthur Anderson's help. The transactions included the creation of spin-off entities, several same-day wire transfers of cash, a large distribution from one of the Canadian subsidiaries to a United-States-based parent, re-classification of a separate foreign subsidiary as a branch of Valero for tax purposes, and the extinguishment of debt.

This loss was big enough to catch the government's eye, and the IRS began investigating. The IRS eventually issued a summons to Arthur Andersen, seeking all documents related to

> tax planning, tax research, or tax analysis, by or for, Ultramar Diamond Shamrock (including any of its subsidiaries or partnerships, both domestic and foreign) and Valero Energy Corporation (including any of its subsidiaries or partnerships, both domestic and foreign) in connection with their 2001, 2002 and 2003 Canadian and U.S. income taxes . . . .

Valero, as a third party, asked the district court to quash the summons. *See* 26 U.S.C. § 7609(b). It argued that the summons was overbroad and that many documents were protected by either the work-product doctrine or the tax practitioner-client privilege. The privilege shields communications between a federally authorized tax practitioner and her client "to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney." 26 U.S.C. § 7525(a)(1). The government countered by arguing that the scope of the summons was appropriate and that even if the tax practitioner-client privilege applied, the documents were discoverable since they were made in connection with the promotion of a tax shelter, a statutory exception to the privilege. *Id*. at § 7525(b). The government presented little evidence to back up this claim and rested, instead, on Valero's failure to deny that saving on taxes was one of its motivations for the 2002 transactions.

There was no clear victor in this first dispute. The district court concluded that the IRS issued the summons in good faith and that it was not overly broad. The court rejected Valero's claim of privilege under the work-product doctrine but, after an *in camera*, document-by-document review, sustained its claim of privilege under the tax practitioner-client privilege. In doing so, the court rejected the government's argument regarding the tax shelter promotion exception, noting that it failed to meet its burden to prove the exception's applicability by simply relying on Valero's silence. The court then directed Valero to produce any documents withheld based only on the overbreadth and work-product objections.

This order resulted in a second round of document production. Valero found new documents responsive to the summons and sought to keep some of them out of the grasp of the government by again asserting the tax practitioner-client privilege. The government then filed a motion to enforce the summons before the district court, arguing, as it did before, that the privilege did not apply, and if it did, the tax-shelter exception required Valero to produce the documents. This time, though, the government acted with more gusto. It supported its argument with a detailed declaration from the IRS agent conducting the investigation into Valero's tax liabilities. Attached to this declaration were several exhibits—including e-mails, billing records, and minutes from Valero's board meetings—to bolster the contention that one of the driving purposes behind the multitude of transactions in 2002 was to avoid paying taxes. Valero

responded by asserting that Arthur Anderson was not trying to sell or peddle a corporate tax shelter, and therefore the exception was inapplicable. It contended that the rigamarole was necessary for paying off public debt, saving some Canadian taxes, and restructuring the business operations. The foreign currency losses, Valero maintained, were a natural result of fulfilling these goals. The government, however, poked holes in these purported motivations, arguing that the savings in United States taxes were much more substantial than any savings in Canadian taxes and that Valero could have achieved these purposed aims in a more direct manner without triggering the foreign currency losses.

The added support won over the district court. After another round of *in camera*, document-by-document review, the court rejected some of Valero's claims of privilege outright. The court did sustain the privilege for other documents but held that some of these documents were discoverable since they fell within the exception for documents promoting tax shelters. This time, the court reasoned, the government had met its burden. The court found that it had laid a foundation in fact that Arthur Andersen promoted (by providing input and helping to organize) a multi-step plan, a significant purpose of which was to avoid federal income taxes.

Valero appeals this second ruling. It has combed through the documents that the district court found unprotected and has identified a subset that, it argues, should have been privileged. We granted a stay, allowing the contested documents to remain under seal, and Valero

has provided a sealed appendix containing these documents for our review. Valero first attacks the district court's finding that a group of documents were not privileged since they concerned "business or accounting advice or state tax issues." Valero argues that the district court clearly erred in its assessment of 14 of these documents, emphasizing that they cover federal tax issues.

We begin by noting that there is no general accountant-client privilege. *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999). In 1998, Congress provided a limited shield of confidentiality between a federally authorized tax practitioner and her client. This privilege is no broader than the existing attorney-client privilege. It merely extends the veil of confidentiality to federally authorized tax practitioners who have long been able to practice before the IRS, *see* 5 U.S.C. § 500(c); 31 C.F.R. § 10.3, to the same extent communications would be privileged if they were between a taxpayer and an attorney. 26 U.S.C. § 7525(a)(1) (privilege does not apply in criminal proceedings). Nothing in the statute "suggests that these nonlawyer practitioners are entitled to privilege when they are doing other than lawyers' work . . . ." *Frederick*, 182 F.3d at 502; *see also United States v. BDO Seidman*, 337 F.3d 802, 810 (7th Cir. 2003) (*BDO II*). Accounting advice, even if given by an attorney, is not privileged.

This means that the success of a claim of privilege depends on whether the advice given was general accounting advice or legal advice. Admittedly, the line between a lawyer's work and that of an accountant can be blurry, especially when it involves a large corporation

like Valero seeking advice from a broad-based accounting firm like Arthur Anderson. But we have set some guide-posts to help distinguish between the two. For starters, the preparation of tax returns is an accounting, not a legal service, therefore information transmitted so that it might be used on a tax return is not privileged. *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000); *Frederick*, 182 F.3d at 500-01; *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983). On the other side of the spectrum, communications about legal questions raised in litigation (or in anticipation of litigation) are privileged. *In re Grand Jury Proceedings*, 220 F.3d at 571; *Frederick*, 182 F.3d at 502. Of course, there is a grey area between these two extremes, but to the extent documents are used for both preparing tax returns and litigation, they are not protected from the government's grasp. *In re Grand Jury Proceedings*, 220 F.3d at 571; *Frederick*, 182 F.3d at 501. This circumscribed reading of the tax practitioner-client privilege is in sync with our general take on privi-leges, which we construe narrowly because they are in derogation of the search for truth. *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997).

On top of that, our review of the district court's ruling is deferential, and we will reverse only if it is clearly erroneous. Findings regarding privilege are fact-intensive, case-specific questions that fall within the district court's expertise, and, under these circumstances, "a light appellate touch is best." *Frederick*, 182 F.3d at 499. And as is the case with any privilege, the one seeking its protection must carry the burden of showing that it applies. *United States v. BDO Seidman, LLP*, 492 F.3d 806,

822 (7th Cir. 2007) (*BDO III*). The narrowness of the tax practitioner-client privilege, our deferential standard of review, and the allocation of the burden of proof all pose high hurdles for Valero. Obstacles, as it turns out, Valero is unable to overcome.

Valero's contention that the documents consist of federal tax advice misses the mark. As we've noted, there is no general privilege between a federal tax practitioner and her client—it's not enough that the communications raised federal tax topics. Many of these documents consist of worksheets containing financial data and estimates of tax liability, while others discuss deductions and the calculations of gains and losses. These documents contain the type of information generally gathered to facilitate the filing of a tax return, and such accounting advice is not covered by the privilege, *Frederick*, 182 F.3d at 500, whether or not the information made it on the tax returns filed by Valero, *Lawless*, 709 F.2d at 487. Still other documents raise issues about Valero's inventory methods, compensation packages, or general structure, and analyze how they affect tax computations. While these documents contain some legal analysis, it comes part and parcel with accounting advice, and is therefore also open to the government. *In re Grand Jury Proceedings*, 220 F.3d at 571. Simply asserting that the documents discuss federal tax issues does not convince us that the district court clearly erred in finding them discoverable.

Next, Valero contends that nine other documents should be privileged because the district court, in its view, wrongly concluded that they were accessible because they

consisted of internal documents passed amongst the accountants and not the client. This argument, however, misconstrues the district court's order. The district court concluded that several memoranda and notes to the file written by the accountants were not privileged because they "do not reflect a communication between a client and a tax practitioner *for the purpose of providing federal income tax advice*." (emphasis added). In fact, in other parts of its order (as Valero itself notes) the district court extended the privilege to cover internal documents that did not involve the client. The order is a bit vague as to why certain documents fell outside of the privilege. But one can hardly blame the court—providing too much detail could spill the beans about the documents, even before Valero could ask for a stay. Regardless, Valero has not presented any convincing arguments to over-turn the ruling. It again asserts that the documents did in fact discuss federal tax issues. But as we have already stated, that alone is not enough.

Although we consider the applicability of the privilege here to be a close question with regard to some of the documents, our review is highly deferential, and Valero's arguments fall short of this demanding standard. Having reached this conclusion, we need only quickly address Valero's final contention with regards to these documents. It maintains that the district court abused its discretion by failing to afford Valero an opportunity to bolster its claim of privilege in either an *ex parte* hearing or by propounding sealed, written questions. While testimony from those who produced the documents in question may be necessary to evaluate a claim of privi-

lege, *In re Grand Jury Proceedings*, 220 F.3d at 572, it is not always required. Here, the district court had adequate information to evaluate the claim of privilege after reviewing the documents themselves, and we find no abuse of discretion in its course of conduct.

The more interesting question raised by this appeal concerns an exception to the tax practitioner-client privilege. As we've noted, Valero's claim of privilege wasn't a complete bust. The district court agreed that Valero met its initial burden as to some of the documents but ordered a subset to be released after it concluded that they fell into a statutory exception to the privilege. The privilege does not cover any written communications with a corporate representative or agent "in connection with the *promotion* of the direct or indirect participation of the person in any tax shelter . . . ." *Id.* at § 7525(b)(2) (emphasis added). Valero disputes the court's finding by attacking its interpretation of the statutory exception. Few courts have examined this exception and none have squarely addressed the question that Valero raises here:  namely, what exactly does it mean to promote a tax shelter?

The parties have plucked two different definitions of promotion out of the dictionary. Valero, seeking to narrow the application of the tax shelter exception, contends that promotion means the "active furtherance of sale of merchandise through advertising or other publicity." Valero takes it a step further and urges us to consider the tax practitioner's merchandise to be prepackaged, tax-shelter products. Since Arthur Anderson provided Valero

with an individualized tax reduction plan, not a one-size-fits-all scheme, Valero contends that the documents are beyond the government's reach. The government, unsurprisingly, reads promotion more expansively to mean "furtherance" or "encouragement" and asks us to affirm the district court's decision to release the documents under the tax-shelter exception.

A statute is not ambiguous simply because one of its words is susceptible to two meanings. When interpreting a statute we must read it as a whole, as opposed to looking at single words in isolation, *see United States v. Morton*, 467 U.S. 822, 828 (1984), and doing so here goes a long way to resolving this controversy. Valero's reading of the statute creates an unnecessary conflict. While Congress left promotion up to judicial interpretation, it took care to define tax shelter by explicit reference to another section of the tax code. For purposes of the exception, a tax shelter is "(I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax." 26 U.S.C. § 6662(d)(2)(C)(ii). Nothing in this definition limits tax shelters to cookie-cutter products peddled by shady practitioners or distinguishes tax shelters from individualized tax advice. Instead, the language is broad and encompasses any plan or arrangement whose significant purpose is to avoid or evade federal taxes. *See BDO III*, 492 F.3d at 823 (noting that the tax shelter exception is broad "but such breadth does not make the text ambiguous"). By advocating such a narrow definition of

promotion, Valero is, through the back door, proposing a definition of tax shelters at odds with the text of the statute. We decline to read such a contradiction into the statute. This definition of tax shelter is broad and could, as Valero points out, include some legitimate attempts by a company to reduce its tax burden. But it is not our place to tinker with the unambiguous definition provided by Congress. And even under this definition, tax shelters are not boundless. Only plans and arrangements with a significant—as opposed to an ancillary—goal of avoiding or evading taxes count.

But Valero goes further and argues that accepting the definition of promotion put forth by the district court would effectively read the word out of the statute by granting the government access to any documents connected to a tax shelter. And if that's the case, Valero urges, the exception will swallow the privilege. We disagree. Promotion, even under the broader reading, limits the exception to written communications encouraging participation in a tax shelter, rather than documents that merely inform a company about such schemes, assess such plans in a neutral fashion, or evaluate the soft spots in tax shelters that a company has used in the past. In fact, the district court's ruling here belies Valero's alarmist argument. Even operating under a broad definition of promotion, the court sustained some of Valero's claims of privilege. The district court's understanding of promotion does place limits on the exception, just not the limits that Valero wants.

This same observation also undermines Valero's reliance on *United States v. Textron Inc. and Subsidiaries*,

507 F. Supp. 2d 138 (D. R.I. 2007). The *Textron* court is among the few to have examined the scope of the tax-shelter exception, and thus, even though *Textron* is not binding authority, it deserves a close look. In that case, the IRS sought tax-accrual work papers prepared by Textron's in-house accountants and lawyers. Those papers identified items on tax returns susceptible to challenge by the IRS and estimated, in percentage terms, Textron's chances of prevailing in any litigation over those issues. Textron refused to release the work papers, arguing that they were protected by the tax practitioner-client privilege (among others). The government countered by contending that the work papers were fair game under the tax-shelter exception. The district court, however, disagreed with the government, reasoning that the work papers reflected opinions "regarding the foreseeable tax consequences of transactions that, already, had taken place, not future transactions they were seeking to promote." *Id.* at 148.[1] *Textron* thus stands for the rather uncontroversial principle that you can't promote participation in something once the deed is already done. While the court did mention that the

---

[1] The district court went on to find that Textron waived the privilege by releasing the work papers to its outside accountants, and the First Circuit reviewed the case without discussing the tax practitioner-client privilege. *United States v. Textron Inc. and Subsidiaries*, 553 F.3d 87 (1st Cir. 2009) (addressing claims regarding work-product doctrine). The First Circuit has since vacated this decision and will rehear the case en banc. *United States v. Textron*, No. 07-2631 (1st Cir. Mar. 25, 2009).

Textron accountants were not "peddlers of corporate tax shelters," *id.*, that dicta does Valero little good since there is a fundamental difference between the documents Textron sought to shield from the government and those that Valero seeks to protect. Valero's documents concern the structure of (what was then) future transactions, not those that have already taken place.

What's more, the district court's definition of "promotion" jibes with the IRS's broad summons power. 26 U.S.C. § 7602(a). Our system of federal taxation relies on self-reporting and the taxpayer's forthright disclosure of information. The government's power to compel disclosure of relevant information is the flip side of that coin. The summons power is the looming threat that helps keep the taxpayer honest, and the more honest taxpayers there are, the more equitably the tax burden is shouldered. Because the IRS's investigatory power is a linchpin in our system, courts are reluctant to restrict it "absent unambiguous directions from Congress." *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984) (citations omitted); *see also BDO II*, 337 F.3d at 810. The privilege chips away at the IRS's summons power:  we will not broaden it by narrowly interpreting exceptions without clear direction from Congress. The word "promotion" is not a clear enough signal to place such a limit on the IRS's summons power.

Perhaps anticipating this conclusion, Valero turns to the legislative history of the tax-shelter exception to bolster its argument. For starters, since the statute is unambiguous we need not turn to the legislative history

to interpret its meaning. *BDO III*, 492 F.3d at 824. But even if we were to consider it, it would do little to support Valero's position. The strongest endorsement for Valero's argument comes from Senator Connie Mack, who stated during a conference committee that the exception should be "narrow" and target "written promotional and solicitation materials used by the peddlers of corporate tax shelters." 144 Cong. Rec. S7667 (1998). But the view of one senator cannot trump the unambiguous statutory text. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002); *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir. 2005) ("[W]hen the legislative history stands by itself, as a naked expression of 'intent' unconnected to any enacted text, it has no more force than an opinion poll of legislators—less, really, as it speaks for fewer."). Valero also points to Senator Daniel Moynihan's comments expressing dismay at the confusion that would, in his view, arise from the privilege and its exception. Senator Moynihan thought that the privilege would be "a right that most taxpayers will never be eligible to assert, and many will be surprised to learn about [its] limitations." 144 Cong. Rec. S7621 (1998). Senator Moynihan, although implying support for a broader privilege, highlighted the narrowness of the privilege as written in the statute. His statement does Valero more harm than good.

Finally, Valero points to the conference report which clarifies that "the promotion of tax shelters [is not a] part of the routine relationship between a tax practitioner and a client," and should not "adversely affect such routine relationships." H.R. Rep. No. 105-199 at 269 (1998). A conference report, unlike the words of a single senator,

is often a good record of Congress's intent, *Bassiouni v. F.B.I.*, 436 F.3d 712, 716 (7th Cir. 2006), but the report does not go nearly as far as Valero contends. The report does nothing to confine the exception to actively marketed tax shelters or prepackaged products. In fact, in the same paragraph relied upon by Valero, the report reiterates the breadth of the definition of tax shelters to include "any partnership, entity, plan, or arrangement a significant purpose of which is the avoidance or evasion of income tax." H.R. Rep. No. 105-599 (1998).

We close by noting what this opinion does not do. At this early stage, we are not evaluating the propriety of Valero's tax-reduction plan. The IRS only wants access to documents, it is not (in this appeal) asking Valero to pay anything. It is not pointing any fingers. The government's burden to overcome the privilege is relatively light—it need only show that there is some foundation in fact that a particular document falls within the tax-shelter exception. *BDO III*, 492 F.3d at 822. We affirm the district court's holding that the IRS has met this burden and leave for another day any other issues which may percolate out of this squabble between Valero and the government.

Accordingly, the judgment of the district court is AFFIRMED. The partial stay of the district court's judgment is dissolved.