# In the

# United States Court of Appeals

## For the Seventh Circuit

————————

Nos. 05-3260 & 05-3518

UNITED STATES OF AMERICA,

*Petitioner-Appellant,*
*Cross-Appellee,*

*v.*

BDO SEIDMAN, LLP, regarding IRS
examination of BDO Seidman, LLP,

*Respondent-Appellee,*

and,

ROBERT S. CUILLO, et al.,

*Intervenors-Appellees,*
*Cross-Appellants.*

————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 4822—**James F. Holderman**, *Chief Judge.*

————————

ARGUED SEPTEMBER 11, 2006—DECIDED JULY 2, 2007

————————

Before RIPPLE, KANNE and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* This is the third appeal arising
out of an effort by the Internal Revenue Service ("IRS") to
enforce administrative summonses against BDO Seidman,

LLP ("BDO"), an accounting firm that allegedly failed to disclose potentially abusive tax shelters that it promoted. *See United States v. BDO Seidman*, 337 F.3d 802 (7th Cir. 2003) (*BDO II*); *United States v. BDO Seidman*, Nos. 02-3914 & 02-3915, 2002 WL 32080709 (7th Cir. Dec. 18, 2002) (*BDO I*). The IRS now appeals the district court's ruling that sustained BDO's claim of attorney-client privilege with respect to a memorandum written by one of BDO's employees. The IRS also appeals a separate ruling that sustained the tax practitioner and/or attorney-client privilege asserted by a number of BDO's clients ("Intervenors") with respect to 266 documents. The Intervenors cross-appeal the district court's ruling that one document, Document A-40, fell within the crime-fraud exception to the attorney-client and/or tax practitioner privilege. For the reasons set for forth in this opinion, we affirm in part and vacate and remand in part.

# I

## BACKGROUND

### A. The Enforcement Action

In September 2000, the IRS received information suggesting that BDO was promoting potentially abusive tax shelters without complying with the Internal Revenue Code's ("IRC") listing requirements for such tax shelters. *See* 26 U.S.C. §§ 6111(a), 6112(a) (2000); *BDO II*, 337 F.3d at 806. Potentially abusive tax shelters included those transactions defined as "tax shelters" under § 6111(c) and arrangements identified by regulation as potentially abusive

under § 6112(b).[1] Organizers of any potentially abusive tax shelter were required to maintain a list of persons to whom an interest in the shelter was sold. *See* 26 U.S.C. § 6112(a) (2000). Additionally, organizers and sellers of § 6111(c) tax shelters were required to register the tax shelter with the IRS. *See id.* § 6111(a). Failure to follow these registration and list-keeping requirements was sanctionable by penalties. *See id.* §§ 6707, 6708.[2]

The IRS commenced a compliance investigation into BDO's alleged violations. The IRS issued twenty summonses commanding production of documents, testimony relating to the transactions and information on the identity of the clients who had invested in the transactions. *BDO II*,

---

[1] Sections 6111 and 6112 of the IRC were amended by the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 815, 118 Stat. 1418, 1581-83 (2004). The Act eliminated the distinction between § 6111(c) tax shelters and other arrangements identified by the Secretary under § 6112(b)(2) by replacing the terms "tax shelter" and "potentially abusive tax shelter" with "reportable transaction." Reportable transactions are "any transaction[s] with respect to which information is required to be included with a return or statement because . . . such transaction is of a type which the Secretary determines as having a potential for tax avoidance or evasion." 26 U.S.C. § 6707A. All reportable transactions must be reported to the IRS, *see id.* § 6111(a) (2000 & Supp. IV 2004), and must satisfy the IRC's list-keeping requirements, *see id.* § 6112(a).

[2] Sections 6707 and 6708 also were amended by the American Jobs Creation Act, *see* Pub. L. No. 108-357, §§ 816-817, 118 Stat. 1418, 1583-84 (2004), but they continue to provide penalties for failure to comply with the registration and list-keeping requirements of §§ 6111 and 6112. *See* 26 U.S.C. §§ 6707 & 6708 (2000 & Supp. IV 2004).

337 F.3d at 805-06. When BDO resisted these summonses, the IRS petitioned the United States District Court for the Northern District of Illinois for enforcement. *Id.* at 806. BDO contended that the summonses could not be enforced because the investigation had no legitimate purpose. It also contended that the summonses were overbroad, issued in bad faith and sought information already in the IRS' possession. Lastly, BDO submitted that the information sought was irrelevant to the investigation. *Id.* at 806. BDO further asserted that a number of the documents were protected by the attorney-client privilege, the tax practitioner privilege under 26 U.S.C. § 7525(a) or work product protection. *BDO II*, 337 F.3d at 806. The district court ruled that the IRS had issued the summonses in good faith and that enforcement would not constitute an abuse of process. It ordered BDO to produce all responsive documents except for those previously listed on privilege logs and submitted to the court by BDO for in camera inspection. *Id.* at 806-07.

BDO then notified its clients that it intended to produce documents that would reveal their identities to the IRS. In response, a number of clients sought to intervene as of right in order to assert the tax practitioner privilege under 26 U.S.C. § 7525(a).[3] The district court denied the motions to intervene, holding that the tax practitioner privilege would not prevent disclosure of the clients' names. *See BDO II*, 337 F.3d at 807. The clients appealed this denial to this court.

On December 18, 2002, we entered an order remanding the case to the district court to permit it to undertake an

---

[3]  *See* John and Jane Does Emergency Motion to Intervene, R.38; Richard and Mary Roes Emergency Motion to Intervene, R.42.

in camera inspection of the documents for which the would-be anonymous intervenors asserted a privilege. *See BDO I*, 2002 WL 32080709, at *1. We ordered the district court to make more extensive findings with respect to the claim of tax practitioner privilege for each document, taking into account the totality of the circumstances. *Id.* After conducting this in camera review, the district court determined that the tax practitioner privilege did not prevent disclosure of the clients' identities. R.73 at 7-31. The clients again appealed, and we affirmed the district court's ruling on the question of privilege and its denial of the motions to intervene. *BDO II*, 337 F.3d at 813.

After our decision affirming the district court's denial of the anonymous clients' motion to intervene, the Intervenors sought intervention as of right in order to assert a claim of privilege under the attorney-client privilege, tax practitioner privilege or work product doctrine with respect to 267 documents. The IRS filed a document titled "United States' Concurrence in Intervenors' Motions to Intervene and Challenge to Claims of Privilege" in which it argued that the district court should grant the motion, or, in the alternative, deny the claim of privilege. The IRS and the Intervenors also filed a joint motion in which the IRS consented to the intervention and the parties set forth a proposed briefing schedule. On July 15, 2004, the district court granted the Intervenors' motion.

## B. Intervenors' Claims

The Intervenors asserted attorney-client privilege, tax practitioner privilege or work product protection with respect to 267 documents. The IRS submitted that the documents either were not covered by the tax practitioner

privilege under the tax shelter exception found in 26 U.S.C. § 7525(b), as it existed at the time of the communications, or that the documents fell within the crime-fraud exception to both the attorney-client and tax practitioner privileges.

According to the IRS, BDO, in conjunction with other firms, had engaged in the practice of selling prepackaged tax shelters, the sole purpose of which was the unlawful attempt to evade tax liability. The district court determined that the IRS had failed to make a prima facie showing of crime or fraud that would justify a blanket determination that all of the documents fell within the crime-fraud exception. R.178 at 16. The court noted that, just because the IRS characterized the transactions "as abusive and unlawful cookie cutter tax shelters," such a characterization did not make them so. *Id.* at 17. The court added that the question of whether BDO and the Intervenors had violated the IRC was the ultimate issue in the IRS' investigation and that a finding of fraud based solely on the IRS' allegations "would place the proverbial 'Cart before the Horse.' " *Id.* In a footnote, the district court added that, based on these same considerations, it could not hold that the Intervenors or BDO were engaged in tax shelters which would fall within the tax shelter exception to the tax practitioner privilege. *Id.* at n.6.

Although the district court was unwilling to apply the crime-fraud exception in blanket fashion, it proceeded to review each document in camera to determine whether individual documents fell within the crime-fraud exception. *Id.* at 18. In conducting the review, the district court looked to the totality of the circumstances to determine whether there was sufficient evidence of crime or fraud to bring a document within this exception. *Id.* at 23. To guide this evaluation, the district court identified eight non-

exclusive, non-determinative "potential indicators of fraud" which it drew from arguments made by the IRS, from two other cases involving allegedly fraudulent practices by BDO and from an unrelated IRS enforcement action against another accounting firm. R.178 at 23.[4] Based

---

[4]  The first case to which the district court looked in deriving its potential indicators of fraud was *Denney v. Jenkens & Gilchrist*, 340 F. Supp. 2d 338 (S.D.N.Y. 2004). That case involved a civil RICO class action in which the plaintiffs alleged that Jenkens & Gilchrist had developed and BDO and others had marketed a tax shelter known as the Currency Options Bring Reward Alternatives ("COBRA"). BDO sought to enforce an arbitration clause in its consulting agreements. Based on what it deemed to be admissions by the parties, the court in *Denney* concluded that BDO and its clients had engaged in mutual fraud in connection with the consulting agreements to conceal the true purpose of the agreements: providing the clients with tax shelters advice. *Id.* at 346. Because the contracts were the product of mutual fraud between BDO and its clients, the arbitration clause was unenforceable. *Id.* at 347. The court based its conclusion that the contracts were mutually fraudulent on the vague language in the consulting agreements and its findings that BDO did not provide any of the consulting services described in the agreements. *Id.* at 346-47.

The next case the district court looked to in developing its potential indicators of fraud was *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324 (E.D. Pa. 2004). Like *Denney*, *Miron* involved the enforceability of an arbitration clause in one of BDO's consulting agreements and related to the COBRA transaction. *See id.* at 327. The district court in *Miron* noted the factors that led the court in *Denney* to find that the consulting agreements had been the product of mutual fraud, but concluded that the consulting agreements at issue were factually distinguishable.

(continued...)

on these cases and other factors that the IRS had submitted were indicative of fraud, the district court arrived at the following eight factors to guide its in camera review of each of the 267 documents:

> (1) the marketing of pre-packaged transactions by BDO; (2) the communication by the Intervenors to BDO with the purpose of engaging in a pre-arranged

---

[4] (...continued)

*See id.* at 329-30. In particular, the court found that BDO had provided the services described in its consulting agreements. *Id.* The court in *Miron* noted also that, unlike the consulting agreements in *Denney*, in which the only identified goal was expanding business operations, the consulting agreements at issue were intended to limit also the clients' financial exposure on those expansions. *Id.* at 329. Based on these differences, the court concluded that the consulting agreements were not similarly suggestive of fraud. *Id.*

The third case to which the district court looked in arriving at its potential indicators of fraud was *United States v. KPMG LLP*, 316 F. Supp. 2d 30 (D.D.C. 2004). Unlike *Denney* and *Miron*, *KPMG* did not involve BDO. *KPMG* involved an action brought by the IRS to enforce summonses it issued to the accounting firm of KPMG as part of its investigation into KPMG's alleged promotion of, and participation in, tax shelters. *Id.* at 31-32. The court in *KPMG* held that boilerplate opinion letters provided to KPMG clients by the law firm of Brown & Wood were not protected by the attorney-client privilege because they had been provided as a part of "KPMG's marketing machine" rather than as reasoned legal advice. *Id.* at 40. The district court in the present action found the findings of the court in *KPMG* consistent with the IRS' allegation that BDO had engaged in the promotion of prepackaged tax shelters rather than individualized tax advice. *See* R.178 at 23.

transaction developed by BDO or [a] third party with the sole purpose of reducing taxable income; (3) BDO and/or the Intervenors attempting to conceal the true nature of the transaction; (4) knowledge by BDO, or a situation where BDO should have known, that the Intervenors lacked a legitimate business purpose for entering into the transaction; (5) vaguely worded consulting agreements; (6) failure by BDO to provide services under the consulting agreement yet receipt of payment; (7) mention of the COBRA transaction; and (8) use of boiler-plate documents.

R.178 at 23. The court further noted that the presence of these factors alone would not be sufficient to establish a prima facie case of fraud. *See id.* at 23-24. Rather, the potential indicators of fraud were intended to serve merely as guideposts. *See id.* at 24. The ultimate question of whether a prima facie showing of crime or fraud had been made with respect to a particular document was to be determined under the totality of circumstances.

Based on this review, the district court held that, with the exception of Document A-40, the IRS had failed to make a prima facie showing of a crime or fraud. *Id.* at 24. Thus, the district court upheld the Intervenors' claim of privilege with respect to 266 of the 267 documents, although it did not specify which privilege (attorney-client or tax practitioner) applied to each document. *See id.* at 13-14, 29.

After finding prima facie evidence that Document A-40 fell within the crime-fraud exception, the district court permitted the Intervenors to provide an explanation that would negate the evidence of crime or fraud. *Id.* at 24. The Intervenors provided their explanation to the court and the IRS responded. On May 17, 2005, after finding the Intervenors' explanation insufficient to rebut the prima

facie evidence of crime or fraud, the district court ruled that Document A-40 fell within the crime-fraud exception to the tax practitioner or attorney-client privilege. R.190 at 10.

After the district court issued its final ruling with respect to Document A-40, the Court of Appeals for the Second Circuit reversed the decision of the United States District Court for the Southern District of New York in *Denney v. Jenkens & Gilchrist*, 340 F. Supp. 2d 338 (S.D.N.Y. 2004). *See Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 66 (2d Cir. 2005). The Intervenors moved for reconsideration under Rule 60(b) of the Federal Rules of Civil Procedure, arguing that, because the district court had relied on *Denney* when establishing the factors that would guide its in camera review of each document, the court should reexamine its earlier ruling. R.210 at 2-3. The district court denied the motion, holding that the Second Circuit's decision did not affect the controlling law in this case. *Id.* at 3. The court added that its finding of prima facie evidence of crime or fraud was based on the totality of the circumstances, an inquiry guided, but not controlled, by the eight factors it previously had identified. *Id.* at 6.

## C.  BDO's Privilege Claims

While its clients were seeking to intervene to protect their claims of privilege, BDO asserted its own claims of attorney-client privilege and work product protection with respect to 110 documents. The IRS responded that the documents were neither protected attorney-client communications nor work product, and, even if they were, the documents fell within the crime-fraud exception. R.127 at 2. After conducting an in camera inspection of each

document, the district court determined that 103 of the documents were within the attorney-client privilege and that one other document, though not covered by the attorney-client privilege, fell within the work product doctrine. *Id.* at 3-9. However, the court concluded that six documents, as submitted to the court in redacted form, were not within the attorney-client privilege and ordered their disclosure as so redacted. *Id.* at 7. Based on the same in camera review, the district court found no evidence that the communications in 104 documents protected by the attorney-client privilege or work product doctrine were made to further a crime or fraud. *Id.* at 10.

One of the 104 documents that the district court had found to fall within the attorney-client privilege was a memorandum written by Michael Kerekes ("Kerekes Memorandum"). Kerekes was a lawyer and partner at BDO. In August 2000, he wrote a memorandum to BDO's outside counsel, David Dreier, a tax attorney with the law firm of White & Case LLP, requesting legal advice on pending IRS regulations. In January 2001, Donna Guerin, an attorney at the law firm of Jenkens & Gilchrist, received a copy of the memorandum under circumstances that remain the subject of dispute.[5] At the time attorney Guerin

---

[5]  Guerin received the memorandum by fax. She asserts that the memorandum was sent to her by Robert Greisman, a partner with BDO. Greisman contends that he does not remember faxing the memorandum to Guerin and that on the day it was faxed to her he was at a meeting at a hotel in Los Angeles. There is no record of a fax having been sent from the hotel to Jenkens & Gilchrist on that day and the document itself does not display

(continued...)

received the Kerekes Memorandum, Jenkens & Gilchrist did not represent BDO, but these two entities, one an accounting firm and the other a law firm, serviced jointly clients on the same or related matters. According to attorney Guerin, she received the letter from BDO as input into an opinion letter regarding tax shelters that Jenkens & Gilchrist was preparing for both BDO and their common clients. Although BDO and Jenkens & Gilchrist subsequently were co-defendants in civil litigation, *see, e.g.*, *Denney v. Jenkens & Gilchrist*, 340 F. Supp. 2d 338, there was no litigation pending against BDO or Jenkens & Gilchrist at the time attorney Guerin received the Kerekes Memorandum.

After the district court's ruling on BDO's claim of privilege for the 110 documents, the IRS received the Kerekes Memorandum from Jenkens & Gilchrist in response to a subpoena. Upon viewing the memorandum, the IRS requested the court reconsider its privilege ruling with respect to the Kerekes Memorandum. The IRS asserted that

---

[5] (...continued)
the phone number of the origin of the fax. Further, the memorandum was not received in a single transmission. The last three pages of the memorandum were sent at around 3:20 p.m., with the balance of the memorandum, that is, the first portion of the memorandum, being sent in a separate transmission at around 4:00 p.m. In addition to the memorandum being sent out of order in two transmissions, the fax heading indicates that those portions of the memorandum sent at around 3:20 p.m. began at the second page of the transmission. The fax heading of the transmission sent around 4:00 p.m. indicates that the portion of the memorandum sent at that time began at the eighth page of the transmission. The balance of both transmissions does not appear in the record.

the document fell within the crime-fraud exception to the attorney-client privilege or, alternatively, that the privilege had been waived. Based on its prior in camera review of the document, the district court rejected the IRS' claim that the Kerekes Memorandum fell within the crime-fraud exception. R.180 at 3-4. The court noted that, even though the contents of the Kerekes Memorandum were new to the IRS, they were not new to the court, and it had considered the arguments presented by the IRS in its prior in camera review of the Kerekes Memorandum. The district court further held that disclosure of the Kerekes Memorandum to attorney Guerin did not waive BDO's claim of privilege because the memorandum related to a common legal interest shared by BDO and Jenkens & Gilchrist and therefore fell within the common interest doctrine. *Id.* at 6. The district court added that it would reach the same conclusion even if the common interest doctrine did not apply because it had found ample precedent to sustain the privilege as an unintentional disclosure. *Id.*

## II

## DISCUSSION

The IRS timely appealed the district court's ruling with respect to the Kerekes Memorandum. The IRS contends that BDO waived any claim of privilege with respect to the memorandum when it disclosed the document to attorney Guerin. The IRS submits that the common interest doctrine does not apply because the communication was not made in anticipation of litigation. It further contends that the disclosure was voluntary, and, therefore, BDO cannot claim that the privilege is preserved because any disclosure was inadvertent. Alternatively, the IRS

contends that the district court erred by not reconsidering its ruling that there was no evidence of crime or fraud in connection with the Kerekes Memorandum after it found such evidence with respect to Document A-40.

The IRS also appeals the district court's ruling that the tax shelter exception to the tax practitioner privilege, 26 U.S.C. § 7525(b) (2000), does not apply to the 267 documents for which the Intervenors claimed the privilege. The IRS contends that the burden was on the Intervenors to prove that the tax shelter exception did not apply, a burden the IRS claims the Intervenors did not meet.

The Intervenors cross-appeal the district court's finding of prima facie evidence of crime or fraud with respect to Document A-40. The Intervenors submit that the district court's finding was in error because the IRS failed to make a prima facie showing of each element of a particular crime or common law fraud.

### A.  The Kerekes Memorandum

We first shall address whether the district court erred in sustaining BDO's claim of attorney-client privilege under the common interest doctrine and in rejecting the IRS' position that the Kerekes Memorandum fell within the crime-fraud exception to the attorney-client privilege.

We review all necessary findings of fact and all applications of law to fact in connection with the district court's ruling on a privilege claim for clear error. *See United States v. Frederick*, 182 F.3d 496, 499 (7th Cir. 1999) (application of law to fact); *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (findings of fact). We shall reverse only if, on review of the entire evidence, we are "left with the definite

and firm conviction that a mistake has been committed." *Malachinski v. Comm'r*, 268 F.3d 497, 505 (7th Cir. 2001) (quoting *Coleman v. Comm'r*, 16 F.3d 821, 824 (7th Cir. 1994)) (internal quotation marks omitted). On the other hand, the scope of a privilege is a question of law that we review de novo. *See BDO II*, 337 F.3d at 809. We review a district court's decision regarding the crime-fraud exception for an abuse of discretion. *United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007).

In federal courts, except when state law supplies the applicable rule of law, the attorney-client privilege is "governed by the principles of the common law as [it] may be interpreted by the courts of the United States in the light of reason and experience." Fed. R. Evid. 501. Although it ultimately was not adopted by Congress, the rule of attorney-client privilege promulgated by the Supreme Court in 1972 as part of the Proposed Federal Rules of Evidence has been recognized "as a source of general guidance regarding federal common law principles." *In re Grand Jury Investigation*, 399 F.3d 527, 532 (2d Cir. 2005); *see also* 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 503.02 (Joseph M. McLaughlin, ed., 2d ed. 2006). Proposed Rule 503 provided:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and the lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and

a representative of the client, or (5) between lawyers representing the client.

*See* Proposed Fed. R. Evid. 503(b), 56 F.R.D. 183, 236 (1972). Put simply, in order for the attorney-client privilege to attach, the communication in question must be made: (1) in confidence; (2) in connection with the provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client relationship.

The purpose of the privilege is to "encourage full disclosure and to facilitate open communication between attorneys and their clients." *BDO II*, 337 F.3d at 810. Open communication assists lawyers in rendering legal advice, not only to represent their clients in ongoing litigation, but also to prevent litigation by advising clients to conform their conduct to the law and by addressing legal concerns that may inhibit clients from engaging in otherwise lawful and socially beneficial activities. *See Frederick*, 182 F.3d at 500. The cost of these benefits is the withholding of relevant information from the courts. *BDO II*, 337 F.3d at 811.

Recognizing the inherent tension between the beneficial goals of the attorney-client privilege and the courts' right to every person's evidence, the courts have articulated the following principles to inform our analysis of the scope of the common interest doctrine:

(1) "[C]ourts construe the privilege to apply only where necessary to achieve its purpose." *Id.*

(2) Only those communications which "reflect the lawyer's thinking [or] are made for the purpose of eliciting the lawyer's professional advice or other legal assistance" fall within the privilege. *Frederick*, 182 F.3d at 500.

(3) Because one of the objectives of the privilege is assisting clients in conforming their conduct to the law, litigation need not be pending for the communication to be made in connection to the provision of legal services. *See United States v. Schwimmer*, 892 F.2d 237, 243-44 (2d Cir. 1989).

(4) Because "the privilege is in derogation of the search for truth," any exceptions to the requirements of the attorney-client privilege "must be strictly confined." *In re Grand Jury Proceedings (Thullen)*, 220 F.3d 568, 571 (7th Cir. 2000).

Although occasionally termed a privilege itself, the common interest doctrine is really an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person. *See Robinson v. Texas Auto. Dealers Ass'n*, 214 F.R.D. 432, 443 (E.D. Tex. 2003). In effect, the common interest doctrine extends the attorney-client privilege to otherwise non-confidential communications in limited circumstances. For that reason, the common interest doctrine only will apply where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise. *See Evans*, 113 F.3d at 1467. Other than these limits, however, the common defense doctrine does not contract the attorney-client privilege. Thus, communications need not be made in anticipation of litigation to fall within the common interest doctrine.[6]

---

[6] The weight of authority favors our conclusion that litigation need not be actual or imminent for communications to be within the common interest doctrine. At least five of our sister

(continued...)

Applying the common interest doctrine to the full range of communications otherwise protected by the attorney-client privilege encourages parties with a shared legal interest to seek legal "assistance in order to meet legal requirements and to plan their conduct" accordingly. *See In re Regents of the Univ. of California*, 101 F.3d 1386, 1390-91 (Fed. Cir. 1996). This planning serves the public interest by advancing compliance with the law, "facilitating the administration of justice" and averting litigation. *Id.* at 1391. Reason and experience demonstrate that joint venturers, no less than individuals, benefit from planning their activities based on sound legal advice predicated upon open communication.

Having determined that BDO is not barred from asserting attorney-client privilege under the common interest

---

[6] (...continued)
circuits have recognized that the threat of litigation is not a prerequisite to the common interest doctrine. *See In re Grand Jury Subpoena (Custodian of Records, Newparent, Inc.)*, 274 F.3d 563, 572 (1st Cir. 2001); *In re Regents of the Univ. of California*, 101 F.3d 1386, 1390-91 (Fed. Cir. 1996); *United States v. Aramony*, 88 F.3d 1369, 1392 (4th Cir. 1996); *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989); *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987), *aff'd in part and vacated in part on other grounds*, *United States v. Zolin*, 491 U.S. 554 (1989). We have found only one circuit that requires a "palpable threat of litigation at the time of the communication." *United States v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002) (quoting *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 711 (5th Cir. 2001)). This position runs contrary to the "established [rule] that the attorney-client privilege is not limited to actions taken and advice obtained in the shadow of litigation." *In re Regents of the Univ. of California*, 101 F.3d at 1390.

doctrine simply because it was not shared under the threat of litigation, we next shall determine whether the district court's ruling on BDO's claim of privilege was clearly erroneous. The district court recognized that the scope of the common interest doctrine is limited to a common *legal* interest to which the parties formed a common strategy. *See* R.180 at 6. The district court concluded that BDO and Jenkens & Gilchrist, acting as joint venturers, shared a common legal interest "in ensuring compliance with the new regulation issued by the IRS," *id.*, and in making sure that they could defend their product against potential IRS enforcement actions.

There was, moreover, sufficient evidence to support the district court's determination in this regard. The Kerekes Memorandum originally was addressed to BDO's outside counsel, White & Case, and it sought advice on a legal question. At the time attorney Guerin received the Kerekes Memorandum, BDO and Jenkens & Gilchrist jointly serviced a number of common clients with respect to certain tax products. According to Guerin, Robert Greisman, a partner at BDO, sent her the memorandum as part of BDO's effort to coordinate with Jenkens & Gilchrist a common legal position that BDO and Jenkens & Gilchrist would communicate later to these common clients.[7]

Nonetheless, the IRS asserts that, because the purpose of the communication was to coordinate the content of the message to their common clients, the communication between BDO and Jenkens & Gilchrist was not made for

---

[7] There is no contention that the final communication from the joint venturers to their clients was privileged.

the purpose of securing advice with respect to a common legal interest and, therefore, was not within the scope of the common interest doctrine. However, even if the ultimate reason for sharing the Kerekes Memorandum was to advance the joint interests of BDO and Jenkens & Gilchrist in their representations to their common clients, it does not follow that the communication itself was not made to secure legal advice with respect to a common legal interest. Communications do not cease to be for the purpose of receiving legal services just because the recipient intended to use the fruits of the legal services to guide its relations with customers. In essence, through the memorandum, two joint venturers, BDO and Jenkens & Gilchrist, undertook a consultation between their respective in-house counsel and BDO's outside counsel with respect to the legality of the proposed financial course of action they would recommend to their common clients. This effort, as the district court recognized, was clearly within the scope of the common interest doctrine.

The district court's findings do not leave us "with the definite and firm conviction that a mistake has been committed." *Malachinski*, 268 F.3d at 505 (quoting *Coleman*, 16 F.3d at 824) (internal quotation marks omitted). The district court's finding that the communication of the Kerekes Memorandum to attorney Guerin was within the common interest doctrine was not clearly erroneous. Further, because the privileged status of communications falling within the common interest doctrine cannot be waived without the consent of all of the parties, Jenkens & Gilchrist's subsequent voluntary disclosure of the Kerekes Memorandum in response to the IRS' subpoena did not waive BDO's claim of privilege. *See John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers,*

*AFL-CIO*, 913 F.2d 544, 556 (8th Cir. 1990); *In re Grand Jury Subpoenas (89-3 & 89-4, John Doe 89-129)*, 902 F.2d 244, 248 (4th Cir. 1990); *see also* Advisory Committee's Note, Proposed Fed. R. Evid. 503(b), 56 F.R.D. 183, 239 (1972).[89]

---

[8] The district court held in the alternative that, even if the Kerekes Memorandum did not fall within the common interest doctrine, disclosure of the memorandum by BDO to attorney Guerin was inadvertent. The court concluded that, because the disclosure was inadvertent, BDO had not waived its claim of privilege for the memorandum. The IRS also challenges this alternative holding. Because the district court's application of the common interest doctrine was not clear error, we need not address this alternative ruling.

[9] The IRS contends that, after the court found that Document A-40 fell within the crime-fraud exception, the district court should have revisited its conclusion that the crime-fraud exception to the attorney-client privilege did not vitiate the privilege with respect to the Kerekes Memorandum.

The IRS *did* challenge specifically the district court's earlier determination that the crime-fraud exception did not apply to the Kerekes Memorandum. *See* R.152 (sealed). This challenge pre-dated, however, the district court's determination with respect to Document A-40. Indeed, on the same day that the district court announced its initial conclusion that the IRS had made a prima facie showing that the communications in Document A-40 were made in furtherance of crime or fraud, the district court rejected the IRS' identical challenge to the Kerekes Memorandum. At no time after the district court stated that it had found prima facie evidence of crime or fraud with respect to Document A-40 did the IRS request the district court to re-evaluate its earlier ruling with respect to the Kerekes Memorandum. The IRS was not without opportunity to raise the issue. As discussed in greater detail in Part II.B,

(continued...)

**B. Document A-40**

We now address whether the district court erred when it held that the Intervenors could not assert a privilege with respect to Document A-40 because the document fell within the crime-fraud exception to the attorney-client and tax practitioner privileges. We review a district court's decision regarding the crime-fraud exception for an abuse of discretion. *Al-Shahin*, 474 F.3d at 946.

---

[9] (...continued)
after concluding that there was prima facie evidence that Document A-40 fell within the crime-fraud exception, both the Intervenors and the IRS were permitted to submit additional arguments about the applicability of the crime-fraud exception to Document A-40. The IRS availed itself of this opportunity and filed additional memoranda with the court opposing the Intervenors' answer to the court's preliminary findings of crime or fraud with respect to Document A-40. Nowhere in these papers did the IRS request the district court revisit its earlier rulings on the Kerekes Memorandum.

Based on this record, we must conclude that the IRS has waived this issue. We have recognized that the waiver rule exists to provide the district court with the first opportunity to rule on a party's theories. *Bailey v. Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, Local 374*, 175 F.3d 526, 530 (7th Cir. 1999). This requirement assures that we shall not usurp the role of the district court by engaging in initial fact finding. *Id.* It also assures an adequate record for review, *id.*, a particularly important function in cases such as this one, where the fact-specific nature of the inquiry lies within the trial court's particular expertise, *see Frederick*, 182 F.3d at 499. Because the issue the IRS presents on appeal was never before the district court, we are left with no basis to evaluate the district court's ruling on a particularly fact-bound issue. The issue is waived.

The crime-fraud exception places communications made in furtherance of a crime or fraud outside the attorney-client privilege. *United States v. Zolin*, 491 U.S. 554, 563 (1989). The exception is based on the recognition that the privilege necessarily will "protect the confidences of wrongdoers." *Id.* at 562. This cost is accepted as necessary to achieve the privilege's purpose of promoting the "broader public interests in the observance of law and the administration of justice." *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)) (internal quotation marks omitted). However, when the advice sought relates "*not to prior wrongdoing*, but to *future wrongdoing*," the privilege goes beyond what is necessary to achieve its beneficial purposes. *Id.* at 562-63 (quoting 8 John Henry Wigmore, Evidence In Trials At Common Law § 2298 (John T. McNaughton rev. 1961)) (internal quotation marks omitted) (emphasis in original).

To invoke the crime-fraud exception, the party seeking to abrogate the attorney-client privilege must present prima facie evidence that "gives colour to the charge" by showing "some foundation in fact." *Al-Shahin*, 474 F.3d at 946 (quoting *Clark v. United States*, 289 U.S. 1, 15 (1933)) (internal quotation marks omitted). The party seeking to abrogate the privilege meets its burden by bringing forth sufficient evidence to justify the district court in requiring the proponent of the privilege to come forward with an explanation for the evidence offered against it. *See United States v. Davis*, 1 F.3d 606, 609 (7th Cir. 1993). The privilege will remain "if the district court finds [the] explanation satisfactory." *Id.*

BDO and the Intervenors would require the party seeking to abrogate the attorney-client privilege to make out a prima facie case of each element of a particular crime or

common law fraud to invoke the crime-fraud exception. Such a burden is inconsistent with our requirement that the party seeking to abrogate the privilege need only "give colour to the charge" by showing "some foundation in fact." *Al-Shahin*, 474 F.3d at 946 (quoting *Clark*, 289 U.S. at 15) (internal quotation marks omitted). The approach advocated by BDO and the Intervenors reflects the view of some circuits, which require enough evidence of crime or fraud to support a verdict in order to invoke the crime-fraud exception. *See In re Feldberg*, 862 F.2d 622, 625 (7th Cir. 1988). We expressly have rejected that approach. *See id.*

We therefore must determine whether the district court abused its discretion in determining that the IRS had come forward with sufficient evidence to give color to its charge that Document A-40 was a communication in furtherance of a crime or fraud. The district court engaged in a document-by-document, in camera inspection of all 267 documents for which the Intervenors claimed a privilege to determine whether they fell within the crime-fraud exception. R.178 at 18. In determining whether there was prima facie evidence of criminal or fraudulent activity, the court looked at the totality of the circumstances, including the eight "potential indicators of fraud" discussed above.[10]

---

[10] As noted above, the eight potential indicators of fraud identified by the district court were:

> (1) the marketing of pre-packaged transactions by BDO; (2) the communication by the Intervenors to BDO with the purpose of engaging in a pre-arranged transaction developed by BDO or [a] third party with the sole purpose of reducing taxable income; (3) BDO and/or the Intervenors attempting to conceal the true nature of the transaction; (4)
> (continued...)

*See id.* at 23. Based on the totality of circumstances, the district court found no prima facie evidence of crime or fraud with respect to 266 of the documents, a ruling that the IRS does not challenge.

Applying the same totality of the circumstance approach, the district court found prima facie evidence of crime or fraud with respect to Document A-40 and instructed the Intervenors to come forward with an explanation that would rebut the evidence. *Id.* at 24. The Intervenors responded and the IRS provided further evidence to rebut the Intervenors' response. After considering all of the evidence, the district court concluded that the Intervenors had failed to rebut the prima facie showing of crime or fraud. R.190 at 10.

The Intervenors now challenge the district court's ruling. First, the Intervenors point to the decision of the United States Court of Appeals for the Second Circuit in *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58 (2005), which reversed *Denney v. Jenkens & Gilchrist*, one of the cases from which the district court derived its potential indicators of

---

[10] (...continued)

knowledge by BDO, or a situation where BDO should have known, that the Intervenors lacked a legitimate business purpose for entering into the transaction; (5) vaguely worded consulting agreements; (6) failure by BDO to provide services under the consulting agreement yet receipt of payment; (7) mention of the COBRA transaction; and (8) use of boiler-plate documents.

R.178 at 23.

fraud.[11] *See Denney v. BDO Seidman*, 412 F.3d at 66. The
Second Circuit's decision in *Denney v. BDO Seidman* does
not draw into question the district court's totality of the
circumstances analysis in this case.

In *Denney v. BDO Seidman*, the Second Circuit held that
the District Court for the Southern District of New York
had erred when it concluded, without factual support in
the record, that the parties had agreed that their agree-
ments were mutually fraudulent. *Denney v. BDO Seidman*,
412 F.3d at 66. The Second Circuit's decision did not
address whether facts such as mention of the COBRA
transaction, vaguely worded consulting agreements or
failure to provide services under the consulting agree-
ments, i.e., the factors that the district court in the pres-
ent case derived from *Denney v. Jenkens & Gilchrist*, would
be indicative of fraud. Moreover, the district court in the
present case did not place dispositive weight on any one
of the "potential indicators of fraud," nor did the court
limit its analysis to the eight potential indicators. R.190
at 5.

The remainder of the Intervenors' challenge asserts that
the IRS could not defeat the Intervenors' claim of privilege
under the crime-fraud exception because the IRS had failed
to allege a particular offense or the elements of common
law fraud, and, in any event, the Intervenors had come
forward with rebuttal evidence showing a legitimate
purpose underlying the transactions in question. As we
already have noted, our case law does not require a party

---

[11] The potential indicators of fraud the district court drew from
*Denney v. Jenkens & Gilchrist* were mention of the COBRA
transaction, vaguely worded consulting agreements and
failure to provide services under the consulting agreements.

seeking to invoke the crime-fraud exception to allege a particular offense or to make a prima facie showing with respect to each element of common law fraud. The IRS only was required to present sufficient evidence to "give colour to the charge" that the communication was made in furtherance of a crime or fraud by showing "some foundation in fact." *Al-Shahin*, 474 F.3d at 946 (quoting *Clark*, 289 U.S. at 15) (internal quotation marks omitted).

After concluding that there had been a prima facie showing that Document A-40 was a communication made in furtherance of a crime or fraud, the district court gave the Intervenors the opportunity to explain the communication. The Intervenors offered an explanation, but the district court did not find it satisfactory. Nor was the district court required to find the explanation satisfactory. Thus, the district court did not abuse its discretion when it concluded that the IRS had made a prima facie showing of crime or fraud which the Intervenors failed to explain satisfactorily.

### C. Tax Practitioner Privilege

We now shall address whether the district court correctly applied the tax practitioner privilege found in § 7525 to the facts of this case. Prior to 2004, § 7525 provided:

> § 7525. Confidentiality privileges relating to taxpayer communications
>
> (a) Uniform application to taxpayer communications with federally authorized practitioners.—
>
> > (1) General rule.—With respect to tax advice, the same common law protections of confidentiality which apply to a communication between a tax-

payer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney.

(2) Limitations. Paragraph (1) may only be asserted in—

(A) any noncriminal tax matter before the Internal Revenue Service; and

(B) any noncriminal tax proceeding in Federal court brought by or against the United States.

(3) Definitions. For purposes of this subsection—

(A) Federally authorized tax practitioner. The term "federally authorized tax practitioner" means any individual who is authorized under Federal law to practice before the Internal Revenue Service if such practice is subject to Federal regulation under section 330 of title 31, United States Code.

(B) Tax advice. The term "tax advice" means advice given by an individual with respect to a matter which is within the scope of the individual's authority to practice described in subparagraph (A).

(b) Section not to apply to communications regarding corporate tax shelters. The privilege under subsection (a) shall not apply to any written communication between a federally authorized tax practitioner and a director, shareholder, officer, or employee, agent, or representative of a corporation in connection with the

> promotion of the direct or indirect participation of such corporation in any tax shelter (as defined in section 6662(d)(2)(C)(iii)).

26 U.S.C. § 7525 (2000). To determine whether the district court correctly applied § 7525, we first must address: (1) the elements of the privilege and, specifically, whether the "exception" to the privilege for communications related to tax shelters is an element of the privilege or whether it is a true exception; and (2) the scope of the tax shelter exception.

### 1.  Elements of the Tax Practitioner Privilege

As with all assertions of privilege, the proponent of the tax practitioner privilege must establish each element of the privilege. *See BDO II*, 337 F.3d at 811. On the other hand, with respect to exceptions to the privilege, the burden rests on the party seeking to overcome an otherwise valid claim of privilege to prove preliminary facts that would support a finding that the claimed privilege falls within an exception. *See* Charles Alan Wright & Kenneth W. Graham, Jr., 24 Federal Practice & Procedure § 5507, at 571 (1986).

The IRS submits that § 7525(b)'s ("subsection (b)") tax shelter "exception" to the tax practitioner privilege is not an exception to the privilege, but an element of the privilege itself. Thus, under the IRS' theory, the party asserting the privilege must establish that the communication was not made, in the words of the statute, "in connection with the promotion of the direct or indirect participation . . . in any tax shelter." 26 U.S.C. § 7525(b) (2000). The Intervenors, on the other hand, contend that the tax shelter "exception" is a true exception to the tax practitioner privilege, and, consequently, the opponent of the privilege bears the

burden of establishing that the communication falls within the exception.

Prior to the American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 (2004),[12] subsection (b) read:

> The privilege under subsection (a) shall not apply to any written communication between a federally authorized tax practitioner and a director, shareholder, officer, or employee, agent, or representative of a corporation in connection with the promotion of the direct or indirect participation of such corporation in any tax shelter (as defined in section 6662(d)(2)(C)(iii)).

---

[12] The American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 (2004), amended subsection (b) to read:

> The privilege under subsection (a) shall not apply to any written communication which is—
>
> > (1) between a federally authorized tax practitioner and
> > > (A) any person,
> > >
> > > (B) any director, officer, employee, agent, or representative of the person, or
> > >
> > > (C) any other person holding a capital or profits interest in the person, and
> >
> > (2) in connection with the promotion of the direct or indirect participation of the person in any tax shelter (as defined in section 6662(d)(2)(C)(ii)).

26 U.S.C. § 7525(b) (2000 & Supp. IV 2004). These changes applied only to communications made after October 24, 2004. *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 813(b), 118 Stat. 1418, 1581 (2004). The Act did not amend the elements of the tax practitioner privilege set forth in § 7525(a).

26 U.S.C. § 7525(b) (2000). The plain wording of this subsection evinces a clear intent to treat the rule embodied in subsection (b) as an exception to the tax practitioner privilege. The first sentence of subsection (b) refers to "the privilege under subsection (a)." *Id.* The fact that the privilege does not apply to the class of communications described in subsection (b) presupposes the existence of an otherwise applicable privilege.

This conclusion is supported further by the structure of § 7525 as a whole. Section 7525(a) ("subsection (a)") sets out a general rule, *id.* § 7525(a)(1), specific limitations on the situations in which that rule may be asserted, *id.* § 7525(a)(2), and defines key terms that further limit the scope of the rule, *id.* § 7525(a)(3). By placing some specific limitations on the general rule together with the general rule in subsection (a) while placing other limitations on the general rule in subsection (b), the structure of the statute suggests that not all limitations to the privilege are of the same character. The most natural reading of the section as a whole is to consider those limitations to the scope of the general rule found in subsection (a) to constitute elements of the privilege and those limitations found in subsection (b) as exceptions to the application of that privilege.

The rationale underlying the tax shelter exception further supports this conclusion. Subsection (b) originally was added in conference committee. The report of the conference committee explained that "[t]he Conferees [did] not understand the promotion of tax shelters to be part of the routine relationship between a tax practitioner and a client." H.R. Rep. No. 105-599 at 269 (1998) (Conf. Rep.). This rationale is analogous to the rationale underlying the crime-fraud exception, i.e., advice given to further future

crime or fraud goes beyond what is necessary to achieve the beneficial aims of the privilege. *See Zolin*, 491 U.S. at 562. Thus, in both situations, the rationale underlying the limitation on the claimed privilege goes to the necessity of the communications to achieve the beneficial aims of the privilege.

Thus, based on the text, structure and purpose of subsection (b), it is clear that the tax shelter "exception" is a true exception to the tax practitioner privilege. As with any other exception to a claimed privilege, the burden rests on the opponent of the privilege to prove preliminary facts that would support a finding that the claimed privilege falls within an exception. *Cf.* Wright & Graham, 24 Federal Practice & Procedure § 5507, at 571. As with the crime-fraud exception, the opponent meets this burden by bringing forth enough evidence to show "some foundation in fact" that the exception applies. *Cf. Al-Shahin*, 474 F.3d at 946 (quoting *Clark*, 289 U.S. at 15) (internal quotation marks omitted).

### 2.  Scope of the Tax Shelter Exception

The Intervenors contend that the tax shelter exception found in subsection (b) applies only to tax shelters that shelter corporate taxes. The Intervenors rely on the subsection's heading and the legislative history of subsection (b) to support this contention. The IRS, on the other hand, submits that the tax shelter exception, as it existed in 2002, was not so limited. To support its position, the IRS relies on the text of the statute and the legislative history of subsection (b). The question thus becomes whether the tax shelter to which the communication relates must shelter corporate, as opposed to individual, taxes.

We begin with the text of the statute. "Only if the plain language of the statute is inconclusive or clearly contravenes expressed congressional intent do we look beyond the words themselves." *Oneida Tribe of Indians v. Wisconsin*, 951 F.2d 757, 761 (7th Cir. 1991). To discern the scope of the tax shelter exception, we must look to the elements of the exception. To fall within subsection (b), a communication must be: (1) written; (2) "between a federally authorized tax practitioner and a director, shareholder, officer, or employee, agent, or representative of a corporation"; and (3) made "in connection with the promotion of the direct or indirect participation of such corporation in any tax shelter" as defined by 26 U.S.C. § 6662(d)(2)(C)(ii).[13] 26 U.S.C. § 7525(b) (2000). The plain text appears to apply to any tax shelter falling within the definition of a tax shelter found at 26 U.S.C. § 6662(d)(2)(C)(ii), and at least one district court has found that the tax shelter exception applies to individuals when the tax shelter required the participation of a corporation. *See Doe v. Wachovia Corp.*, 268 F. Supp. 2d 627 (W.D.N.C. 2003).

The Intervenors contend that subsection (b)'s heading, which, prior to the 2004 amendments, read "[s]ection not to apply to communications regarding corporate tax shelters," *see* 26 U.S.C. § 7525(b) (2000), demonstrated a clear congressional intent to limit subsection (b) to tax shelters for corporate income taxes. As a general rule, "[t]he title of a statute . . . cannot limit the plain meaning of the text."

---

[13] Prior to 2004, subsection (b) referred to the definition of "tax shelter" found at 26 U.S.C. § 6662(d)(2)(C)(iii). As a result of amendments to § 6662, that definition is found now at 26 U.S.C. § 6662(d)(2)(C)(ii). For ease of analysis, we shall refer to the current code section.

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (quoting *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1943)) (internal quotation marks omitted) (omissions in original). A statute's heading is "of use only when [it] shed[s] light on some ambiguous word or phrase." *Yeskey*, 524 U.S. at 212 (quoting *Bhd. of R.R. Trainmen*, 331 U.S. at 529) (internal quotation marks omitted) (alterations in original). As noted above, subsection (b) is not ambiguous. If anything, the heading adds ambiguity to subsection (b). Absent this heading, the subsection would not seem limited to corporate tax shelters at all.

Although the section heading suggests that Congress had corporate tax shelters in mind, "the fact that a statute can be applied in situations not expressly anticipated by Congress" demonstrates breadth, not ambiguity. *Yeskey*, 524 U.S. at 212 (quoting *Sedima, S.P.L.R. v. Imrex Co.*, 473 U.S. 479, 499 (1985)) (internal quotation marks omitted). The plain language of subsection (b) is certainly broad because it applies to "*any* written communication . . . in connection with the promotion of the direct or indirect participation of such corporation in *any* tax shelter," 26 U.S.C. § 7525(b) (2000) (emphasis added), but such breadth does not make the text ambiguous.

Further evidence of the intended breadth of the statute is found in its reference to the relatively broad "tax shelter" definition found in 26 U.S.C. § 6662(d)(2)(C)(ii) as opposed to the narrower definitions found in the pre-2004 version of 26 U.S.C. § 6111.[14] The definition of "tax shelter"

---

[14] *See* supra note 1. It is worth noting that the American Jobs Creation Act of 2004 left the definition of "tax shelter" found in § 6662(d)(2)(C)(ii) unchanged.

found at 26 U.S.C. § 6662(d)(2)(C)(ii) defines a "tax shelter" as any partnership, entity, plan or arrangement, a significant purpose of which is the avoidance or evasion of Federal income tax. 26 U.S.C. § 6662(d)(2)(C)(ii).[15]

Because subsection (b) is not ambiguous, we need not look to legislative history to determine its meaning. However, even if we were to consider legislative history, we would not find it useful because that history creates more ambiguity than it eliminates. Even the legislative history that the Intervenors cite in support of its argument that subsection (b) is limited to corporate taxes raises more questions than it answers. The Conference Report upon which the Intervenors rely states that the tax shelters to which subsection (b) applies "include, *but are not limited to*, those required to be registered as confidential corporate tax shelter arrangements under section 6111(d)." H.R. Rep.

---

[15] Prior to the 2004 amendments to the section, 26 U.S.C. § 6111 contained two definitions of "tax shelter" applicable only to § 6111. One of these definitions defined a "tax shelter" as certain investments for which the representations made in connection with the sale of the investment would lead "any person" to believe that the investment would produce a "tax shelter ratio" over a threshold amount. 26 U.S.C. § 6111(c)(1) (2000). The other definition of "tax shelter" previously found in § 6111 defined "tax shelter" as any partnership, entity, plan or arrangement, a significant purpose of which is the avoidance or evasion of Federal income tax for a direct or indirect participant which is a corporation, that is offered under conditions of confidentiality, and for which the promoters receive commissions exceeding $100,000. *Id.* § 6111(d)(1). In contrast, 26 U.S.C. § 6662(d)(2)(C)(ii) makes no reference to dollar or "tax shelter ratio" thresholds, nor does it require the tax shelter to benefit a corporation.

No. 105-599 at 269 (1998) (Conf. Rep.) (emphasis added). All this statement tells us is that the tax shelters referenced in subsection (b) reach a broader class of arrangements than the confidential corporate tax shelters then defined in § 6111(d). It says nothing of how much broader the exception is intended to sweep.

The rest of the legislative history is equally unenlightening. Subsection (b) was added to the bill in conference committee and had not been part of the prior debate on the legislation. After subsection (b) was added, one of the key architects of the bill expressed concern that the privilege itself would lead to confusion and litigation. *See* 144 Cong. Rec. S7626 (daily ed. July 8, 1998) (statement of Sen. Moynihan). Confusion regarding the scope of the tax shelter exception was not limited to members of Congress; tax practitioners themselves expressed confusion as to the breadth of the tax shelter exception. *See* Sheryl Stratton, *Accountant-Client Privilege: Unclear from the Start*, 80 Tax Notes 7 (July 6, 1998).

Next, the Intervenors contend that the tax shelter exception applies only to communications "when the *corporation* is the *taxpayer*." Intervenor's Br. at 20 (italics in original). According to the Intervenors, communication between a federally authorized tax practitioner and an S corporation's officers or agents in connection with the S corporation's participation in a tax shelter therefore would not fall within the tax shelter exception. The Intervenors assert that S corporations are not taxpayers and that "corporation" in this context means a C corporation.[16] *Id.* at 20-21.

---

[16] A number of the Intervenors participated in BDO's programs through S corporations.

We cannot accept this argument. S corporations are both taxpayers and corporations under the IRC.[17] Although S corporations are not subject to taxes imposed by subtitle A, chapter 1 of the IRC, *see id.* § 1363(a), this exception merely means that they do not pay *directly* income taxes. Section 1363 does not exempt S corporations from other taxes imposed by the IRC, such as employment taxes (subtitle C) and excise taxes (subtitles D and E). Notably, the IRC defines "taxpayers" as "any person subject to *any* internal revenue tax." *Id.* § 7701(a)(14) (emphasis added).[18] This definition applies throughout the IRC, except when "otherwise distinctly expressed or manifestly incompatible" with the intent of the statute. *Id.* § 7701(a). Section 7525 does not express distinctly any intent to define "taxpayer" only to include income tax payers, nor would it be "manifestly incompatible" with § 7525 to extend the tax practitioner privilege to advice given in connection with taxes other than income taxes.

Additionally, S corporations must calculate their taxable income, *id.* § 1363(b), and file a return, *id.* § 6037(a). Further, the S corporation's taxable income is calculated in the same manner as an individual's, with certain exceptions which are not relevant here. *Id.* § 1363(b). Indeed, apart

---

[17] If S corporations were not taxpayers, then the tax shelter exception is irrelevant, as the tax practitioner privilege applies only to "communication[s] between a taxpayer and any federally authorized tax practitioner." 26 U.S.C. § 7525(a)(1). If the S corporation is not a taxpayer, the S corporation has no privilege to assert with respect to communications between the S corporation's director, shareholder, officer, employee, agent or representative and a federally authorized tax practitioner.

[18] A corporation is a person for purposes of the IRC. *See* 26 U.S.C. § 7701(a)(1).

from non-separately computed income or losses, which are not relevant here, the S corporation calculates the income or losses passed through to its shareholders by calculating the S corporation's gross income and subtracting "the deductions allowed to *the corporation*." *Id.* § 1366(a)(2) (emphasis added).

The Intervenors provide no support for their argument that the term "corporation," as used in § 7525(b) only means "C corporation." The IRC itself defines an S corporation as a "small business corporation for which an election under section 1362(a) is in effect," *id.* § 1361(a)(1); it defines a C corporation as "a corporation which is not an S corporation," *id.* § 1361(a)(2). This usage alone suggests that, when a particular section of the IRC is intended to apply only to C corporations, Congress will use that term, rather than the generic "corporation." Additionally, the IRC and implementing Treasury Regulations define "corporation" for federal tax purposes as "a business entity organized under a Federal or State statute . . . if the statute describes or refers to the entity as incorporated or as a corporation." 26 C.F.R. § 301.7701-2(b)(1).

The regulations relied upon by the Intervenors in support of their argument that "corporation," as used in subsection (b), means "C corporation" are inapposite. These regulations implement § 6111, which, as we have noted above, applies to a much narrower definition of "tax shelter" than the one applied in subsection (b). Congress chose to define "tax shelter" for purposes of subsection (b) using a broader definition than that found in § 6111. However narrowly the cited regulations may confine the application of § 6111, they are of little relevance in defining the breadth of the definition found in 26 U.S.C.

§ 6662(d)(2)(C)(ii).[19]

---

[19] The regulation to which the Intervenors refer, 26 C.F.R. § 301.6111-2, was promulgated prior to the 2004 amendments to § 6111 (the Intervenors actually cite the temporary regulations, but those regulations have since become permanent; the definition of confidential corporate income tax shelter in the permanent regulations is the same as that in the temporary regulations). Section 6111 was and remains an anti-fraud statute, aimed at providing the IRS with records of financial products marketed for the purpose of reducing Federal income tax liability. The pre-2004 version of § 6111 identified two types of transactions for special scrutiny as "tax shelters." *See* 26 U.S.C. § 6111(c) & (d) (2000). The first sort of transaction defined tax shelters generally as investments offered for sale that, based on the representations in connection with the offering, would lead a reasonable person to infer that the investment would generate deductions and credits exceeding statutorily defined ratio of deductions and credits to the adjusted basis of the initial investment. *See id.* § 6111(c). Further, the investment had to be a registered security or "substantial." *Id.* The second definition of "tax shelter" deemed confidential transactions, a significant purpose of which was the avoidance or evasion of corporate income taxes and for which the tax shelter's promoter may receive at least $100,000 in fees, to be tax shelters. *Id.* § 6111(d). As is evident from the first definition of "tax shelter" found in the pre-2004 version of § 6111, the section as a whole is not limited in its consideration to corporate tax shelters. The regulations the Intervenors cite implement the pre-2004 version of § 6111 only with respect to the second definition of tax shelter, which was only one of the types of transactions identified by § 6111 as requiring special scrutiny. The current regulations continue to identify confidential corporate income tax shelters for purposes of implementing § 6111, even though

(continued...)

Finally, we address the Intervenors' contention that application of the tax shelter exception to tax shelters that do not involve corporate income taxes would "consume[] the general rule" by destroying the privilege any time a corporation participates in a tax shelter. Intervenors' Br. at 20. The Intervenors submit that, if the tax shelter exception

---

[19] (...continued)
§ 6111 no longer uses the term "tax shelter."

Section 6662, on the other hand, is concerned with distinct issues. Section 6662 deals with penalties for underpayment of a taxpayer's tax liability. When an understatement of income is "substantial," § 6662 imposes a penalty of twenty percent of the amount of taxes underpaid. 26 U.S.C. § 6662(a)-(b). However, § 6662 provides that taxpayers may reduce the amount of an understatement, and hence the penalty imposed, by that portion of the understatement resulting from a position taken by the taxpayer for which there was substantial authority or, if the position is disclosed adequately on the tax return, for which there was a reasonable basis for such treatment. *Id.* § 6662(d)(2)(B). As an exception to this general rule, however, § 6662 provides that that portion of an understatement attributable to a tax shelter, i.e., a transaction into which the taxpayer enters, the substantial purpose of which is to avoid or evade income taxes, cannot be used to reduce the amount of the taxpayer's understatement, and hence the penalty imposed. *Id.* § 6662(d)(2)(B)(i). Thus, § 6662 reflects a congressional policy decision that understatements above a particular threshold, i.e., substantial understatements, merit penalties. It also has made the policy choice that certain positions taken on tax returns, i.e., those supported by substantial authority or, when properly disclosed, a rational basis, should not result in the taxpayer incurring penalties unless the position taken is the result of a transaction into which the taxpayer entered for the purpose of evading or avoiding taxes.

extends to individual income taxes, any time a corporation, such as a banking corporation or investment corporation, is involved in the tax shelter, the general rule of tax practitioner privilege will be negated.

A close look at the tax shelter exception makes clear that the Intervenors' submission overstates significantly the scope of that exception. First, the exception applied only to written communications. Second, the written communication must have been between a federally authorized tax practitioner and a director, shareholder, officer, or employee, agent, or representative of a corporation. Third, the written communication must have been "in connection with the promotion of the direct or indirect participation of such corporation in any tax shelter," as defined in § 6662(d)(2)(C)(ii). 26 U.S.C. § 7525(b) (2000).

Because the exception is limited to written communications, oral communications between a tax practitioner and the corporate agent remain within the general rule of privilege. Further, because the tax shelter exception applies only when the written communication relates to the corporation's direct or indirect participation in a particular type of tax shelter, i.e., one meeting the definition found in § 6662(d)(2)(C)(ii), the tax shelter exception will not affect any otherwise privileged communication that does not relate to a transaction falling within that definition.

Most importantly, the tax shelter exception applies only to communications between the tax practitioner and the corporate agent. As noted earlier, the tax practitioner privilege is limited to communications that would be

privileged if they had been made to an attorney.[20] The attorney-client privilege protects only those statements made by the client to the attorney in confidence. *See Evans*, 113 F.3d at 1462. A communication is not made in confidence when the client intends that the communication shall be disclosed to unprivileged third parties. *See* 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 186, at 324 (2d ed. 1994); *see also* Proposed Fed. R. Evid. § 503(a)(4), 56 F.R.D. 183, 236 (1972) ("A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is

---

[20] We have held previously that this limitation means that non-lawyer tax practitioners cannot claim the privilege when "doing other than lawyers' work." *United States v. BDO Seidman*, 337 F.3d 802, 810 (7th Cir. 2003) (quoting *United States v. Frederick*, 182 F.3d 496, 502 (7th Cir. 1999)) (internal quotation marks omitted). This statement cannot be taken to mean that the tax practitioner privilege authorizes non-attorneys to engage in the practice of law when representing others before the IRS. By limiting the availability of the privilege to those individuals authorized to practice before the IRS subject to federal regulations and limiting the scope of the privilege to advice given within the individual's authority as a federally authorized tax practitioner, *see* 26 U.S.C. § 7525(a)(1), (3), § 7525 clearly is not intended to alter the scope of a federally authorized tax practitioner's authority to practice. Further, the regulations governing tax practitioners in activities before the IRS expressly state that nothing in the regulations shall "be construed as authorizing persons not members of the bar to practice law." 31 C.F.R. § 10.32. Taken in context, our prior observations on the scope of the privilege recognize nothing more than communications, though technically within the scope of practice before the IRS, that would fall outside of the attorney-client privilege are also outside of the tax practitioner privilege.

in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication."). However, an exception to this general rule permits disclosure of confidential communications by the attorney to an expert retained for the purpose of rendering legal services. 2 Mueller & Kirkpatrick, Federal Evidence § 186, at 324.

The tax practitioner privilege protects those communications which would be privileged if made to an attorney. *See* 26 U.S.C. § 7525(a). This protection is embodied both in the general rule regarding confidential communications and in the exception for disclosures to experts retained to assist the tax practitioner. With respect to individual income taxpayers, the tax shelter exception has the effect of taking communications intended to be passed along in written form to corporate agents in connection with the corporation's participation in a tax shelter out of the exception for communications to third party experts retained to assist the tax practitioner. Such communications are subject to the general rule that communications to third parties are not privileged. For all other confidential communications between the individual income tax payer and its tax practitioner, both the general rule and the exception for communications to a retained expert apply.

Thus, we cannot accept the Intervenors' prediction that application of the tax shelter exception to individual income tax payers, as it relates to communications made before October 21, 2004, would swallow the general rule of tax practitioner privilege any time a corporation was involved in the shelter.

### 3. The District Court's Decision

We turn now to the district court's ruling that the tax shelter exception did not apply to the Intervenors' documents. It is unclear what legal standard the district court applied in assessing the applicability of the tax shelter exception to the communications at issue. The district court disposed of the matter in a footnote, in which it stated that, for the same reasons it found that the IRS' characterization of the Intervernors' conduct as falling within the crime-fraud exception, it did not find that the Intervenors engaged in tax shelters. *See* R.178 at 17 n.6. However, the tax shelter exception requires no showing of crime or fraud. Further, the record is unclear regarding what evidence, if any, was produced by the IRS to support its contention that the documents fell within the tax shelter exception. The IRS did contend that a significant purpose of the financial products purchased by the Intervenors was to avoid or evade federal income tax and the record reflects that some of the Intervenors had purchased the financial product through a corporation. R.135 at 11. However, the district court's decision does not indicate how these allegations fell short of establishing the applicability of the tax shelter exception.

Additionally, the district court did not note which claims of privilege were sustained based on the attorney-client privilege and which were sustained based on the tax practitioner privilege. *See* R.178 at 13-14, 29. Because we cannot evaluate the legal standard employed by the district court, remand is necessary. *In re Grand Jury Proceedings (Thullen)*, 220 F.3d at 572. Thus, we must vacate the district court's ruling with respect to the applicability of the tax shelter exception and remand for further consideration.

On remand, for each of the 266 documents that the district court concluded to fall within a valid claim of privilege, the court should first determine whether the document falls within the attorney-client privilege, the tax practitioner privilege or both privileges. For those documents that would fall within the attorney-client privilege or both the attorney-client and tax practitioner privilege, no further analysis is required, as the tax shelter exception applies only to the tax practitioner privilege. *See* 26 U.S.C. § 7525(b) (2000). For those documents falling solely within the tax practitioner privilege, the burden rests upon the IRS to come forward with sufficient evidence to demonstrate some foundation in fact that a particular document falls within the tax shelter exception. To meet this burden, the IRS must bring forward evidence that: (1) the communication relates to a tax shelter, as defined by § 6662(d)(2)(C)(ii); (2) the communication was made by a director, shareholder, officer, or employee, agent, or representative of the corporation; and (3) the communication was made in connection with the promotion of the direct or indirect participation of the corporation in such tax shelter.

## Conclusion

For the forgoing reasons, the decision of the district court is affirmed in part and vacated and remanded in part.

AFFIRMED in part,
VACATED and REMANDED in part

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*